## S99P0037. PALMER v. THE STATE.
### (517 SE2d 502)

THOMPSON, Justice.

Willie Williams Palmer was found guilty of two counts of malice murder and two counts of felony murder in the shooting deaths of his wife, Brenda Jenkins Palmer, and his stepdaughter, Christine Jenkins. He was also convicted of kidnapping, burglary, cruelty to chil-

dren, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a crime. The jury recommended a death sentence for each malice murder conviction after finding three statutory aggravating circumstances: the murder of Brenda Palmer was committed while the defendant was engaged in the commission of a burglary; the murder of Christine Jenkins was committed while the defendant was engaged in the commission of a burglary; and the murder of Brenda Palmer was committed while the defendant was engaged in the commission of the murder of Christine Jenkins. OCGA § 17-10-30 (b) (2). The trial court sentenced Palmer to death. He appeals and we affirm.[1]

The evidence adduced at trial shows that Palmer and Brenda Palmer married in 1993. They had a baby, Willshala Palmer, in 1994. Several witnesses testified that Palmer physically abused Brenda and he often threatened to kill her. Brenda separated from Palmer in May 1995 and began divorce proceedings. Palmer owned a piece of land and he told numerous witnesses he would kill Brenda if she tried to take it. In July 1995, he was jailed for violating a restraining order to stay away from Brenda. Brenda, Christine Jenkins (Brenda's 15-year-old daughter), and Willshala moved to a two-room house without running water in Vidette. Brenda had an outstanding loan with a loan company and she told the loan company manager in August 1995 that she feared for her life if Palmer got out of jail. Brenda asked the manager not to tell anyone where she was living.

On September 1, 1995, Palmer was released from jail and he went to the loan company, where he was a regular customer, to borrow money to pay his lawyer. He asked the manager if she had seen Brenda, but the manager did not reply. Palmer said she did not have to answer his question because "I will find her." He added, "when I find her, I will kill that bitch." The manager testified that she was scared by Palmer's cold demeanor when he made this threat. During the next ten days, Palmer threatened to kill Brenda several times in

---

[1] The crimes were committed on September 10 or 11, 1995. On October 23, 1995, Palmer was indicted for malice murder (2 counts), felony murder (2 counts), burglary, kidnapping, cruelty to children, possession of a firearm by a convicted felon and possession of a firearm during the commission of a crime. The trial took place from October 28 to November 8, 1997. Palmer was convicted of all counts on November 7, 1997, and the jury recommended two death sentences for the malice murders the following day. In addition to the death sentences, the trial court sentenced Palmer to twenty years for burglary, ten years for kidnapping, ten years for cruelty to children, five years for possession of a firearm by a convicted felon, and five years for possession of a firearm during the commission of a crime, all sentences to be served consecutively. The felony murder convictions were vacated by operation of law. *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Palmer filed a motion for new trial on November 14, 1997, and an amended motion for new trial on July 22, 1998, which was denied the same day. This case was docketed on September 28, 1998, and orally argued on January 25, 1999.

front of several witnesses. He told one witness that he was "going to do it execution-style" and that it would be on TV.

Palmer was also angry with his ex-girlfriend, Brenda Smith, with whom he lived for 13 years before his marriage to Brenda Palmer and who was living with him again after her house burned down. He told a witness he was "going to kill Brenda [Smith] and the other Brenda," and he told another witness that "there won't be no Brendas." On September 10, 1995, Palmer chased Brenda Smith when she was a passenger in her sister's car and bumped his car into the rear of their car. Brenda Smith fled on foot and Palmer told Brenda Smith's sister, "Y'all don't know who in the hell y'all are playing with."

Palmer also spent part of the day looking for his guns and he asked his son and his nephew where they had been kept while he was in jail. The State presented evidence that Palmer owned a .22 caliber rifle and that he had used this rifle to shoot at his brother on two previous occasions when Palmer was angry with him. That night, Palmer asked his nephew, Frederico Palmer, to ride with him to Augusta. Frederico got into Palmer's blue Caprice Classic, but Palmer drove to Vidette instead.

Palmer asked Frederico, "Do you think I should do this?" Frederico replied, "What are you talking about?" Palmer said, "I'm fixing to go kill Brenda and her daughter." Frederico did not say anything. Palmer parked the car near a laundromat close to Brenda Palmer's house, put on gloves, and pulled out a .22 caliber rifle. He instructed Frederico to drop him off near Brenda's house, park the car by some dumpsters, and catch up to him on foot. Frederico complied. Palmer was fumbling with the telephone box on the side of Brenda's house when Frederico arrived. Palmer asked for help disconnecting the phone line and Frederico unplugged it. Palmer kicked in the front door and turned on the light. Christine Jenkins, Palmer's stepdaughter, was lying on a bed. Palmer said, "Hey Bootie [Christine's nickname], I told you I was coming back." Palmer then shot her once in the face, killing her. Palmer went into the back room where Brenda was holding Willshala in front of her as a shield. Palmer told Frederico to take the baby and Frederico complied, knocking Brenda to the floor. Palmer then killed Brenda by shooting her twice in the head. When the men departed, they left the baby in the house. Palmer concocted an alibi, telling Frederico to say that they had gone to Augusta together to see a friend. Palmer tossed the murder weapon, gloves, and shoes off a bridge.

Two days later, Frederico confessed and led the police to the rifle, gloves, and shoes. He pled guilty to two counts of felony murder and testified for the State. Ballistics testing revealed that the .22 rifle was the murder weapon, and several witnesses, including a

sheriff's deputy who temporarily confiscated the rifle during a 1992 traffic stop, identified this weapon as belonging to Palmer. The recovered shoes were size 11, the same size Palmer wears.

A witness who knows Palmer testified that he saw Palmer's blue Caprice Classic parked near the Vidette laundromat on the night of the murders. The witness said that Palmer's car is easily recognizable because it is missing part of its front grille. At trial, Palmer also attempted to prove that he is mentally retarded through an expert witness and IQ scores that ranged from 61-72. However, the State's expert testified that Palmer malingered on the attempted IQ testing by the State.

1. The evidence was sufficient to authorize a rational trier of fact to find Palmer guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to enable the jury to find the existence of the three statutory aggravating circumstances beyond a reasonable doubt. Id.; OCGA § 17-10-35 (c) (2).

2. Palmer claims that the State violated *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), by exercising its peremptory strikes in a racially discriminatory manner. The jury venire was composed of thirty-two African-Americans and thirty-six whites and the State used all ten of its peremptory strikes to remove African-Americans from the jury. However, the jury which convicted Palmer and recommended a death sentence included eight African-Americans, and the record shows that the State accepted many African-American jurors. The trial court required the State to give race-neutral reasons for its strikes, rendering the preliminary showing of prima facie discrimination moot. *Hernandez v. New York*, 500 U. S. 352, 359 (111 SC 1859, 114 LE2d 395) (1991); *Barnes v. State*, 269 Ga. 345, 349 (6) (496 SE2d 674) (1998). After reviewing the State's reasons for its peremptory strikes, we conclude that the trial court did not abuse its discretion by finding that the reasons were race-neutral and sufficient. *Barnes*, supra (a trial court's finding on whether the opponent of the strikes has met his burden of persuasion is entitled to great deference and affirmed unless clearly erroneous). We find no error in the trial court's *Batson* ruling.

3. The procedure and burden of proof for a defendant seeking to prove mental retardation under OCGA § 17-7-131 (c) (3), that a defendant alleging mental retardation must prove his mental retardation beyond a reasonable doubt in the guilt-innocence phase, are not unconstitutional. *Mosher v. State*, 268 Ga. 555, 558-560 (4) (491 SE2d 348) (1997); *Burgess v. State*, 264 Ga. 777, 789-790 (36) (450 SE2d 680) (1994). The verdict form listing the possible verdict for each count as "guilty but mentally retarded" was also not improper. See OCGA § 17-7-131 (c) (3).

4. Palmer claims that the trial court improperly limited the testimony of a defense psychologist. We disagree. The record shows that the psychologist was reciting some test procedures he might use in some cases when the trial court interjected and told defense counsel to "get down to what we did in this case." This comment by the trial court simply reminded the defense to present relevant testimony, and the psychologist was able to fully explain the test procedures used with Palmer, why they were used, and the results. Since the psychologist's relevant testimony was not limited in any way, we find no error.

5. Palmer argues that the trial judge was not impartial because he made frequent and unnecessary comments, and he asked non-neutral questions to several witnesses. Because Palmer did not object at trial to any alleged judicial partiality, this argument is waived on appeal. *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992). In addition, the record does not support this claim because it shows that the judge's comments and questions were not adversarial.

6. The sentencing phase jury charge was not improper. The trial court did not err by failing to instruct the jury that a unanimous finding on mitigating circumstances is not required, since the trial court charged the jury that it was not necessary to find any mitigating circumstances to impose a life sentence. *McClain v. State*, 267 Ga. 378, 386 (6) (477 SE2d 814) (1996). Also, viewing the charge as a whole, we conclude that the jury was not misled into believing that the beyond a reasonable doubt standard applicable to a finding of mental retardation in the guilt-innocence phase applied to its consideration of alleged mental retardation in the sentencing phase.

7. Palmer argues that the trial court should have granted his plea in bar based on double jeopardy. Palmer's first trial ended in a mistrial when the defense claimed it had not received before trial a statement made by Frederico Palmer (Palmer's accomplice), in violation of OCGA § 17-16-7. At a hearing, the State maintained it has an open-file policy and, in accordance with its standard discovery procedure, it sends defendants copies of every document as soon as they are received. The district attorney testified that he learned Palmer had not been furnished with Frederico's statement when it was pointed out by the defense at trial; and he believes the omission was due to a clerical mistake. There was insufficient evidence of prosecutorial misconduct. See *Roberts v. State*, 267 Ga. 669, 671 (3) (482 SE2d 245) (1997). Moreover, even assuming prosecutorial misconduct, a retrial is not barred because there is no evidence that the prosecutor intended to abort the trial in order to secure an opportunity to retry the case. See *Oregon v. Kennedy*, 456 U. S. 667 (102 SC 2083, 72 LE2d 416) (1982); *Dinning v. State*, 267 Ga. 879, 881 (485 SE2d 464) (1997). Palmer's plea in bar was properly denied.

8. Palmer complains that the trial court erred by allowing the State to introduce four prior incidents as similar transactions in the guilt-innocence phase.

(a) *Palmer shooting at his brother.* The State presented evidence that Palmer shot at his brother, Fready Palmer, on two separate occasions. In October 1992, Fready and the defendant had an argument and "tussled" with each other. Shortly thereafter, Fready was walking down a street when Palmer shot him six times from behind. Palmer then walked up to Fready and told a witness, "He ought to be dead"; Fready feigned death until his brother went away. He thought that the rifle Palmer used to shoot him was the same rifle as the murder weapon. In July 1995, Fready and Palmer had an argument, which escalated into a fight, about whose car was the fastest. About fifteen minutes later, Fready and a friend were in the friend's pickup truck when Palmer fired five times into the truck through the windshield and door. No one was hit. Fready testified that the gun used in this assault was a rifle similar to the murder weapon.

Before evidence of prior crimes is admissible, the trial court must determine that the State has affirmatively shown that: (1) the State seeks to admit evidence of the independent offenses or acts for an appropriate purpose; (2) there is sufficient evidence that the accused committed the independent offenses or acts; and (3) there is sufficient connection or similarity between the independent offenses or acts and the crimes charged so that proof of the former tends to prove the latter. *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991). See also Uniform Superior Court Rule 31.3 (B). The trial court found that the independent acts were offered for an appropriate purpose, to show course of conduct and bent of mind, and that there was sufficient evidence that Palmer committed them. The trial court also found sufficient similarity between the independent acts and the charged crimes so that proof of the independent acts tends to prove Palmer guilty of the murders. We find no error. The prior shootings were similar to the charged crimes and probative of Palmer's method of resolving disputes with family members by shooting at them with a rifle. See *Williams v. State*, 269 Ga. 827, 829 (3) (504 SE2d 441) (1998); *Willingham v. State*, 268 Ga. 64, 64-65 (3) (485 SE2d 735) (1997); *Farley v. State*, 265 Ga. 622, 623-624 (2) (458 SE2d 643) (1995); *Edwards v. State*, 261 Ga. 509, 509-510 (406 SE2d 79) (1991).

(b) *Palmer's assault on Brenda Smith.* The State introduced evidence that Palmer was angry with his ex-girlfriend Brenda Smith on the night of the murders, and had threatened that there will be "no Brendas." A few hours before the murders, Palmer chased Brenda Smith and her sister and crashed his car into the rear of their car. Brenda Smith escaped on foot. The trial court did not err by ruling

that this assault was admissible as a similar transaction.[2] The State sought to introduce evidence of the assault to show bent of mind and motive, and several eyewitnesses testified about it. Proof of Palmer's assault on Brenda Smith on the same night as the murder of Brenda Palmer (in accordance with his stated desire to eliminate both Brendas) tends to prove Palmer guilty of the murder of Brenda Palmer. See *Williams*, 261 Ga. at 642 (2) (b).

(c) *The deputy's identification of the murder weapon as belonging to Palmer.* A sheriff's deputy testified that he pulled Palmer over in 1992[3] and noticed a .22 caliber rifle in the back seat of Palmer's car. The deputy temporarily confiscated the rifle and recorded its serial number. At Palmer's trial, the deputy identified the murder weapon as the same rifle in Palmer's possession during the traffic stop. The evidence of the traffic stop was not a similar transaction, but simply relevant evidence that Palmer possessed the murder weapon. " 'Evidence is relevant to show that [the] accused owned . . . or had in his possession weapons with which the crime was or might have been committed prior to, or after, the commission of the crime.' " *Tyler v. State*, 251 Ga. 381, 382 (2) (306 SE2d 263) (1983) quoting *Wilson v. State*, 215 Ga. 782, 783 (2) (113 SE2d 447) (1960). The deputy's testimony about Palmer's possession of the murder weapon was admissible.

9. The victim-impact evidence was not improper. See *Pickren v. State*, 269 Ga. 453, 453-455 (1) (500 SE2d 566) (1998); *Turner v. State*, 268 Ga. 213, 214-216 (2) (486 SE2d 839) (1997).

10. Although the trial court did not give a charge on the purpose of victim-impact evidence, see *Turner*, 268 Ga. at 216, Palmer never requested such a charge and did not object to the failure of the trial court to give it. Therefore, we find no reversible error. See *Speed v. State*, 270 Ga. 688 (32) (512 SE2d 896) (1999).

11. Palmer complains that a sheriff's investigator testified in the sentencing phase that Palmer told him if he was convicted he would ask the court to kill him. Palmer, however, did not object to this testimony so this issue is waived on appeal. *Earnest*, 262 Ga. at 495 (1).

12. Palmer cried at the end of his testimony in the guilt-innocence phase, and the jury took a break immediately thereafter. The prosecutor referred to Palmer's crying in his guilt-innocence phase closing argument by stating, "And how long did that sobbing last on that witness stand? About ten seconds, until you walked out

---

[2] During the trial, the parties and the trial court erroneously characterized this assault as a "prior difficulty." See *Maxwell v. State*, 262 Ga. 73, 74-75 (2) (b) (414 SE2d 470) (1992), overruled by *Wall v. State*, 269 Ga. 506, 507-508 (2) (500 SE2d 904) (1998).

[3] The trial court prevented the State from presenting evidence about the reason for this traffic stop.

that door." Palmer objected that the prosecutor was referring to matters not in evidence. The trial court stated, "All right. Members of the jury, you will remember the evidence. Argue the evidence and the reasonable deductions." Palmer did not request additional instructions or admonishment by the trial court, and he did not move for a mistrial. " 'It is well settled that a sustained objection to improper argument of counsel cannot serve as the basis for reversal unless it is contemporaneous with a denied motion for mistrial, denied request to strike, or denied request for curative instructions.' " *Kyler v. State*, 270 Ga. 81, 82 (2) (508 SE2d 152) (1998), quoting *Prince v. State*, 257 Ga. 84, 88 (6) (355 SE2d 424) (1987). Since Palmer requested no further action by the trial court after his objection was sustained, there is no reversible error.

13. Palmer argues that his name is incorrect in the indictment, that his real name is Willie Palmer and that the indictment lists a Willie Williams Palmer. He claims error in the denial of his plea of misnomer asserted during jury selection. However, the proper time for filing a plea of misnomer is before arraignment. *Pulliam v. Donaldson*, 140 Ga. 864, 865 (1) (80 SE 315) (1913). Therefore, Palmer's plea of misnomer was untimely. See id.; *Robinson v. State*, 231 Ga. App. 368, 368-369 (1) (498 SE2d 579) (1998). Moreover, Palmer is clearly the person named in the indictment. See *Robinson*, supra.

14. Palmer's death sentences were not imposed as the result of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentences were also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The similar cases in the Appendix support the imposition of the death penalty in this case, in that all involve a murder committed during a burglary or the deliberate, unprovoked killing of two or more people, and thus show the willingness of juries to impose the death penalty under these circumstances.

*Judgment affirmed. All the Justices concur, except Fletcher, P. J., who concurs in judgment only as to Divisions 3 and 8 (a).*

APPENDIX.

*Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State*, 268 Ga. 623 (491 SE2d 791) (1997); *Thomason v. State*, 268 Ga. 298 (486 SE2d 861) (1997); *McMichen v. State*, 265 Ga. 598 (458 SE2d 833) (1995); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Isaacs v. State*, 259 Ga. 717 (386 SE2d 316) (1989); *Moon v. State*, 258 Ga. 748 (375 SE2d 442) (1988); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Blanks v. State*, 254 Ga. 420 (330 SE2d 575) (1985); *Putman v. State*, 251 Ga.

605 (308 SE2d 145) (1983).

DECIDED JUNE 1, 1999 —
RECONSIDERATION DENIED JULY 6, 1999.

*Richard O. Ward, Charlotta Norby,* for appellant.
*Daniel J. Craig, District Attorney, Charles R. Sheppard, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Patricia A. Burton, Assistant Attorney General,* for appellee.