## A01A0113. JEREMIAH v. THE STATE.
(551 SE2d 819)

POPE, Presiding Judge.

Layon Dean Jeremiah was charged with kidnapping, rape, aggravated sodomy, battery, fleeing or attempting to elude a police officer, two counts of possession of a firearm during the commission of a felony, and three counts of aggravated assault. He was tried and acquitted of rape, aggravated sodomy, and one count of aggravated assault, but convicted of the remaining counts. Here, he appeals. For the following reasons, we reverse the battery conviction, but affirm the remaining counts.

Viewing the evidence in the light most favorable to the verdict, it showed that Jeremiah and the victim, L. D., were married at the time of the crimes. L. D. lived with her mother, Myrna Daniel. On March 28, 1998, L. D. left Daniel's home with Jeremiah. When she returned home, her lip and eye were bruised, and her lip was bleeding. L. D. told her mother that Jeremiah had inflicted her injuries. The next day, L. D. went to the hospital where she told the nurse that she had been beaten. The nurse observed that L. D.'s lip was split and swollen, that she had bruises on her chest, neck, and arms, and that she had a large, swollen area over her eye. The nurse called the police, and Officer McGrath met with L. D. and Daniel. During this meeting L. D. told McGrath that she had also been sexually assaulted by her husband.

After reporting this assault, L. D. was taken to the Gwinnett Rape Crisis Center, where she was examined. Gwinnett County police officer Jack Burnette then met with L. D. and Daniel and took their statements. Based on these interviews, Officer Burnette obtained warrants against Jeremiah, charging him with rape, bat-

tery, and aggravated assault. Jeremiah, who was in the Marine Corps and stationed at Camp Lejeune, was not taken into custody that day.

The next day, March 29, 1998, at about 6:40 p.m. the 911 operator received a call from a female at Daniel's residence regarding her "abusive boyfriend." The female then laid the phone down; that call disconnected at 6:43 p.m. Two minutes later, the 911 center received a call from the same residence, and the caller identified herself as Myrna Daniel. The caller said that Jeremiah had come into her home carrying a long box like those used to deliver roses, which contained a shotgun. The caller reported that Jeremiah held the shotgun to Daniel's head and then had taken her daughter from the residence. The radio dispatcher testified at trial that the caller, who identified herself as Daniel, sounded terrified and that her voice was trembling.

In response to the 911 call, Officer McGrath was dispatched to Daniel's residence. The officer met with Daniel, who told him that Jeremiah had forcefully taken L. D. from her home. McGrath took a written statement from Daniel and called investigators.

After notification of the abduction, several Gwinnett County investigators and officers met to devise a plan for arresting Jeremiah. Two investigators waited in Daniel's residence, hoping that Jeremiah would return with L. D., while other investigators were stationed throughout the neighborhood. At 8:52 p.m. one of the investigators saw Jeremiah approaching the residence in a car. The officers watched as Jeremiah's car pulled up to the residence. L. D. got out of the car, and the officers secured her and ran her into the house. Jeremiah's car sped off, driving through yards and over curbs in an effort to avoid the police cars that were chasing him. Eventually Jeremiah wrecked his car, and he then fled on foot. The officers ran after Jeremiah and caught him.

After Jeremiah was taken into custody, his car was impounded and searched. Inside the trunk, the investigators found a long box containing a shotgun and a box of shotgun shells. The following day, Officer Burnette again obtained statements from L. D. and Daniel.

After Jeremiah was arrested, L. D. and Daniel recanted their earlier statements. Daniel did not want to testify at trial, claiming Fifth Amendment privilege. Nevertheless, the State obtained an order granting Daniel immunity, and she was called as a State's witness. L. D. claimed Fifth Amendment and marital privilege and did not testify at trial. The court also entered an order granting Jeremiah's motion in limine as to L. D.'s prior statements, ruling that the State could not use them at trial.

At trial, the State produced evidence that Jeremiah bought the shotgun on the morning of the kidnapping and aggravated assault from a Wal-Mart in Jacksonville, North Carolina. The receipt docu-

menting the transaction was discovered in the glove compartment of his car after his arrest.

Daniel testified that her various statements about Jeremiah had not been true and that she had been trying to break up his relationship with her daughter. She stated that everything she told the police was "100% made up." Neither L. D. nor Jeremiah testified at trial.

1. Jeremiah claims that the trial court erred in denying his challenge based on *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), with respect to the State's striking of an African-American female from the initial panel. The record shows that after jury selection was completed, the trial court asked if the State or Jeremiah had a challenge based on *Batson*. Jeremiah challenged the State's striking of venire person Lovey Stephens, a 71-year-old African-American female retiree. The trial court found that there was a prima facie case and requested a showing from the State that the strike was racially neutral.

The State informed the court that it struck Stephens out of concern that she would empathize too much with Daniel, who at trial was a sympathetic witness for Jeremiah. The State noted that Stephens was the oldest venire person and that she appeared physically frail. The State pointed out that Daniel was also physically frail and suffered from Parkinson's disease. Additionally, the State expressed concern that Stephens' sympathy for Daniel would be strengthened because Daniel did not want to testify and was being forced to by the State. The State then noted that two of twelve jurors selected from the panel of thirty-four were African-Americans.[1]

> When a . . . *Batson* objection is raised, the trial court must engage in a three-step process to determine if peremptory challenges were used in a racially discriminatory manner. First, the opponent of the strike must make a prima facie showing of racial discrimination. Then, the proponent of the strike is required to set forth a race-neutral, case-related, clear and reasonably specific explanation for the exercise of its strikes. An explanation is not race-neutral if it is based on a characteristic that is peculiar to any race or on a stereotypical belief. At this point, the proponent of the strike need not offer an explanation that is persuasive or even plausible — all that is required is an explanation that is facially race-neutral. In the final step, the trial court must determine, considering the totality of the circumstances, whether the opponent of the strikes has shown that the pro-

---

[1] Jeremiah's argument that one of these two jurors was actually an alternate does not affect our analysis.

ponent was motivated by discriminatory intent in the exercise of his strikes. The opponent of the strikes may carry his burden of persuasion by showing that similarly situated jurors of another race were not struck or that the proponent's race-neutral reason for the strike is so implausible or fantastic that it renders the explanation pretextual. A trial court's findings on whether the opponent of the strike has met his burden of persuasion are entitled to great deference and will be affirmed unless clearly erroneous.

(Citations and punctuation omitted.) *Curry v. State,* 238 Ga. App. 511, 513 (1) (519 SE2d 269) (1999).

After hearing the State's explanation and allowing defense counsel a response, the trial court found that the State's explanation for the strike was race-neutral. The court then found that the State had not left on the panel any similarly situated person. Accordingly, the court overruled Jeremiah's objection.

We conclude that the trial court did not abuse its discretion by finding that the reasons were race-neutral and sufficient. See *Palmer v. State,* 271 Ga. 234, 237 (2) (517 SE2d 502) (1999). See also *Barnes v. State,* 269 Ga. 345, 349 (6) (496 SE2d 674) (1998) (a trial court's finding on whether the opponent of the strikes has met his burden of persuasion is affirmed unless clearly erroneous).

2. Jeremiah claims that his trial counsel was ineffective in two ways. First he claims that his trial counsel, Herbert Adams, was ineffective because of a conflict of interest with Jeremiah's previous trial counsel, Brian Whiteside. Jeremiah claims that Whiteside consulted the victim and Daniel and that Adams' "conflict of interest" arose from his close association with Whiteside. Jeremiah further argues that without this conflict Adams might have constructed a better defense at trial.

At the motion for new trial hearing, Jeremiah presented evidence that he was represented in this case first by Drew Powell, who was appointed to represent him at magistrate court. Jeremiah then retained Whiteside, in the summer of 1998. At some point, Jeremiah filed a grievance against Whiteside with the State Bar, which was either withdrawn or dismissed. On March 9, 1999, Whiteside filed a motion to be allowed to withdraw as counsel in the case. The trial court granted the motion on March 12, 1999, and on the same date appointed Adams as counsel for Jeremiah. Adams filed an entry of appearance in the case on March 19, 1999. The trial began on April 19, 1999.

At the hearing on the motion for new trial, Adams testified regarding his extensive experience and about his specific preparation for the trial in this case. Adams denied that he worked with White-

side on the case, although he admitted that he had conferred with Whiteside and with Powell to discuss information that might be helpful to Jeremiah's defense. Adams also admitted that he met with various witnesses in the case, including L. D. and Daniel to discuss the evidence they had.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. The trial court's determination with respect to effective assistance of counsel will be affirmed unless the trial court's findings are clearly erroneous. Included within the constitutional right to counsel is the right to representation that is free from conflicts of interest. In order for appellant to prevail on his claim that his attorney was operating under a conflict of interest that violated his right to counsel, he must show an actual conflict of interest that adversely affected his attorney's performance.

(Citations omitted.) *Turner v. State*, 273 Ga. 340, 342 (2) (a) (541 SE2d 641) (2001).

Jeremiah does not articulate a specific way in which Adams' representation was deficient because of any contact with Whiteside. And, having reviewed the trial transcript, we are unable to find any deficiency in Adams' performance, as Jeremiah alleges. Accordingly, since Jeremiah has not shown that trial counsel operated under an actual conflict of interest that adversely affected his performance, his contention of ineffective assistance of counsel due to a conflict of interest must fail. *Turner*, 273 Ga. at 343. See also *Henry v. State*, 269 Ga. 851, 854 (3) (507 SE2d 419) (1998).

Secondly, Jeremiah claims that his trial counsel was ineffective because he failed to call some favorable witnesses for the accused. Specifically, Jeremiah argues that after the court directed the verdict of acquittal on Counts 1, 5, and 6, L. D. could have given up her marital privilege as to the remaining counts and that his counsel was deficient in failing to call her as a witness. He further contends that counsel should have called as a witness Joan Hall to corroborate the falsity of L. D. and Daniel's early statements.

> To establish ineffectiveness of trial counsel, [Jeremiah] must show that his counsel's performance was deficient and that

the deficient performance prejudiced his defense. The standard for attorney performance is reasonably effective assistance considering all the circumstances, with a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy. The test for reasonable attorney performance is whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. We review a trial court's finding that a defendant has been afforded effective assistance of counsel under the clearly erroneous standard. Matters such as calling a particular witness, questioning on direct and cross-examination, making trial motions, and objecting to testimony are strategic and tactical decisions within the exclusive province of the attorney after consultation with the client.

(Punctuation and footnotes omitted.) *Himmel v. State*, 246 Ga. App. 845, 848 (2) (542 SE2d 557) (2000). Defense counsel's explanations for not calling L. D. and Hall as witnesses established that these decisions were legitimate strategic and tactical trial decisions. There was no deficiency in trial counsel's performance in this regard.

3. Jeremiah claims that the State failed to prove venue beyond a reasonable doubt as to the battery charge in Count 7 of the indictment. This count arose from the incidents on March 29; the count charged that Jeremiah bruised and cut L. D. by striking her with his fists. The State concedes that venue was not established as to the battery count only.

[W]hen a criminal defendant pleads not guilty, he or she has challenged venue, and the State will not be permitted to invoke the exception permitting it to establish venue with mere slight evidence. Quite to the contrary, whenever a criminal defendant pleads not guilty and is put on trial, the State is placed on notice that at trial, it will be required to establish venue beyond a reasonable doubt. Therefore, by its own definition, the slight evidence exception can never be invoked after a criminal defendant pleads not guilty and is placed on trial. . . . The State may establish venue by whatever means of proof are available to it, and it may use both direct and circumstantial evidence. It must, however, come forth in all criminal prosecutions with evidence to show beyond a reasonable doubt that venue is properly laid.

*Jones v. State*, 272 Ga. 900, 902-903 (2) (537 SE2d 80) (2000).

In this case, the record contains no evidence regarding where the battery occurred. Thus, venue as to the battery count was not proven beyond a reasonable doubt. Accordingly, the judgment is reversed with respect to the count of the battery of L. D.[2] The remainder of the judgment is affirmed.

4. Jeremiah claims that the evidence was insufficient to convict. Apart from the venue issue addressed above, this argument lacks merit. We find that a rational trier of fact could find from the evidence adduced at trial proof of Jeremiah's guilt of the remaining counts beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

5. After appellate counsel filed the appellate brief for Jeremiah in this case, Jeremiah's appellate counsel filed a motion to withdraw as counsel, which this court granted. Jeremiah has now filed briefs, and we have reviewed the additional arguments that Jeremiah raises in those briefs. Contrary to Jeremiah's arguments, we find no harmful error in the trial court's handling of the case, except as noted above.

*Judgment affirmed in part and reversed in part. Blackburn, C. J., and Mikell, J., concur.*

DECIDED JULY 5, 2001 — 

Layon D. Jeremiah, *pro se.*
*Daniel J. Porter, District Attorney, R. Keith Miles, Assistant District Attorney*, for appellee.

---

[2] Nevertheless, "if a criminal conviction is reversed because of an evidentiary insufficiency concerning the procedural propriety of laying venue within a particular forum, and not because of an evidentiary insufficiency concerning the accused's guilt, retrial is not barred by the Double Jeopardy Clause." *Jones*, 272 Ga. at 905 (4).