S09A0222. DIXON v. THE STATE.
S09A0223. HOLODICK v. THE STATE.
(677 SE2d 76)

MELTON, Justice.

In these related appeals, co-defendants James Dixon[1] and Lawrence Holodick[2] appeal their convictions for the murder of their roommate, John Michael Carter. For the reasons set forth below, we affirm in both cases.

Viewed in the light most favorable to the verdict, the record shows that Dixon, Holodick, and Carter lived together in a house they rented from their employer. Carter and his roommates often did not get along with each other, and, during the week before Carter's murder, Holodick got into a physical fight with Carter, and Dixon threatened to "push [Carter's] nose into his brain" and choke him. On the night of July 2, 2004, the three men were seen drinking in their driveway after work, and they later moved inside to continue drinking and playing a guitar in the basement of their home, as they often did on weekends. The music stopped abruptly at 12:30 a.m., although the men usually partied until much later, and, at some point that night, a fight began. Carter was stabbed twice in the back of the neck so violently that the blade of the knife broke. After falling to the floor, Carter was then severely beaten by alternating swings of a guitar and its metal stand. Carter was also beaten with a board of shelving. Bits of the guitar embedded in Carter's skin, and the blood splatter evidence at the scene along with the use of multiple weapons

---

[1] On April 22, 2005, Dixon was indicted in Cobb County for the malice murder, felony murder, and aggravated assault of John Michael Carter. Following a jury trial held on December 5-9, 2005, Dixon was found guilty of all crimes. On December 9, 2005, Dixon was sentenced to life imprisonment for malice murder. His conviction for felony murder was vacated by operation of law, *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993), and his conviction for aggravated assault was merged into his murder conviction for purposes of sentencing. On December 15, 2005, Dixon filed a motion for new trial and amended it on July 24, 2007. The trial court denied the motion on March 25, 2008. This appeal was docketed in this Court on October 21, 2008, and submitted for decision on the briefs.

[2] On April 22, 2005, Holodick was indicted in Cobb County for the malice murder, felony murder, and aggravated assault of Carter. Following a jury trial held on December 5-9, 2005, Holodick was found guilty of all crimes. On December 9, 2005, Holodick was sentenced to life imprisonment for malice murder. His conviction for felony murder was vacated by operation of law, *Malcolm v. State*, supra, and his conviction for aggravated assault was merged into his murder conviction for purposes of sentencing. On December 16, 2005, Dixon filed a motion for new trial and amended it on July 24, 2007. The trial court denied the motion on March 25, 2008. This appeal was docketed in this Court on October 21, 2008, and submitted for decision on the briefs.

indicated that Carter was beaten by more than one person at the same time.[3]

That night, Dixon, wearing only a pair of blue shorts and no shoes, walked two and a half miles to a co-worker's apartment and arrived there at approximately 1:30 a.m. Dixon had never been to the co-worker's house before, and he had not been invited or expected that night. Acting nervously, Dixon asked his co-worker for drugs, but the co-worker only gave him beer. Dixon then left and arrived back at his house around 3:00 a.m.[4] The next morning, Dixon went to work while Holodick remained at the house in order to clean. Dixon told his co-workers with whom he carpooled that Carter was either drunk or not at home. On the morning of July 4, 2004, Holodick, who had bruises on his arms, went to a neighbor's house and told the neighbor that he had just discovered Carter's body in the basement and that he could not find Dixon. Holodick admitted that he was at home on Friday and Saturday. Dixon never returned home Saturday after work, but instead traveled to Tifton, Georgia, where he was later found by police. Pieces of the guitar were discovered in the garbage can in front of the home, and the knife handle and the remains of the guitar were later discovered in the woods across the street from the crime scene. After forensic testing, a drop of Carter's blood was found on the blue shorts Dixon had been seen wearing.

This evidence was sufficient to enable the jurors to find both Dixon and Holodick guilty of the crimes for which they were convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

1. Both co-defendants contend that the trial court erred by failing to sever their trials.

> "It is incumbent upon the defendant who seeks a severance to show clearly that [ ]he will be prejudiced by a joint trial, and in the absence of such a showing, the trial court's denial of a severance motion will not be disturbed." (Footnote omitted.) *Green v. State*, 274 Ga. 686, 688 (2) (558 SE2d 707) (2002). Factors to be considered by the trial court are: whether a joint trial will create confusion of evidence and law; whether there is a danger that evidence implicating one defendant will be considered against a co-defendant

---

[3] Carter's time of death was determined to be between 2:30 p.m. on Friday, July 2, 2004 and 6:30 p.m. on Saturday, July 3, 2004.

[4] On his way home, Dixon was stopped momentarily by police at 2:53 a.m., and Dixon was acting suspiciously at the time.

despite limiting instructions; and whether the defendants are asserting antagonistic defenses. [Cit.]

*Rhodes v. State*, 279 Ga. 587, 589 (3) (619 SE2d 659) (2005).

Both defendants contend that their defenses were antagonistic to each other. However, the presence of antagonistic defenses, standing alone, does not require severance absent some showing of harm. *Wicks v. State*, 278 Ga. 550 (3) (604 SE2d 768) (2004). As proof of harm, Holodick contends that, due to the joint trial, Dixon's counsel was allowed to elicit an improper statement incriminating Holodick, and both defendants contend that the joint trial stripped them of peremptory strikes they would have otherwise enjoyed. Neither of these grounds has merit.

With regard to Holodick's argument regarding an incriminating statement, the record shows that, during the investigation of the crimes, a detective took certain statements from Frederick O'Neal, a jail cell informant. O'Neal was not available to testify at trial. During cross-examination, Dixon's trial counsel asked the detective to read O'Neal's statement in order to refresh his memory. The detective mistakenly thought that he was being asked to read the statement out loud and stated: "It just states what [O'Neal] told me regarding they were all there, Larry, Jimmy, and Mike were in the basement drinking."

The State immediately objected to the hearsay statement, the questioning stopped, and the trial court sustained the objection. Thereafter, Holodick further objected, wrongly contending that a *Bruton*[5] violation had occurred and requesting a mistrial. The trial court denied the motion for a mistrial, and, instead, it gave a curative instruction to the jury instructing them to disregard any testimony from O'Neal. Holodick then stated that he did not object to the curative instruction. Under these circumstances, Holodick has not preserved his right to challenge the statement from O'Neal. "If the trial court's curative instructions were not sufficient, [Holodick] should have sought additional relief." (Citations omitted.) *Weems v. State*, 268 Ga. 515, 516 (2) (491 SE2d 325) (1997). Moreover, even if Holodick preserved the argument, there was no harm. O'Neal's statement did not directly implicate Holodick in the murder, as there was no indication of when he may have been in the basement of his home. Moreover, other admissible testimony, including Holodick's own, placed him in the home at the time of the murder, making O'Neal's statement merely cumulative. See, e.g., *Copeland v. State*, 266 Ga. 664, 666 (3) (b) (469 SE2d 672) (1996).

---

[5] *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

Both defendants contend that their trials should have been severed because each defendant would have received a greater number of peremptory strikes if they had been tried separately rather than together.[6] The defendants, however, have failed to show that they were harmed by not receiving more peremptory strikes than they did. The defendants were entitled to be tried by an impartial jury, and they have not shown that the jury they received was not impartial or that any of the jurors who considered their case were unqualified. Moreover,

> [i]f one defendant on trial could have a fair and impartial jury by the exercise of [14] peremptory challenges, how then could another defendant on trial with him not have a fair and impartial jury merely because the crime for which they were on trial was allegedly committed by both defendants?

*Albert v. State*, 235 Ga. 718, 719 (1) (221 SE2d 413) (1975). Therefore, irrespective of the number of peremptory strikes each of the defendants received, they received an impartial jury made up of qualified jurors. As such, there was no harm.

2. Both defendants argue that OCGA § 17-8-4 (b) unconstitutionally violates their rights to equal protection under the law. See U. S. Const. Amend. XIV, Sec. 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."); Ga. Const. of 1983, Art. I, Sec. I, Par. II ("No person shall be denied the equal protection of the laws."). More specifically, the defendants argue that there is no rational basis for each co-defendant in a joint trial to receive fewer peremptory strikes than a defendant in a solo trial.

---

[6] With regard to sole defendants, OCGA § 15-12-165 provides:
Every person accused of a felony may peremptorily challenge nine of the jurors impaneled to try him or her. The state shall be allowed the same number of peremptory challenges allowed to the defendant; provided, however, that in any case in which the state announces its intention to seek the death penalty, the defendant may peremptorily challenge 15 jurors and the state shall be allowed the same number of peremptory challenges.

With regard to co-defendants tried jointly, OCGA § 17-8-4 (b) provides:
When two or more defendants are tried jointly for a crime or offense, such defendants shall be entitled to the same number of strikes as a single defendant if tried separately. The strikes shall be exercised jointly by the defendants or shall be apportioned among the defendants in the manner the court shall direct. In the event two or more defendants are tried jointly, the court, upon request of the defendants, shall allow an equal number of additional strikes to the defendants, not to exceed five each, as the court shall deem necessary, to the ends that justice may prevail. The court may allow the state additional strikes not to exceed the number of additional strikes as are allowed to the defendants.

In their joint trial, the co-defendants received a total of 14 strikes. If they had been tried separately, they would have each received nine strikes.

As we pointed out in *Rodriguez v. State*, 275 Ga. 283, 284-285 (1) (565 SE2d 458) (2002),

> [t]he person who is asserting the equal protection claim has the burden to establish that he is similarly situated to members of the class who are treated differently from him. If the person asserting the violation cannot make the foregoing showing, there is no need to continue with an equal protection analysis.

(Punctuation and footnotes omitted.)

In this case, the defendants contend that co-defendants as a class must be treated the same as the separate class of defendants tried individually. However, equal protection does not require identical treatment of different classes. "[T]he equal protection clause [does not] exact uniformity of procedure. The legislature may classify litigation and adopt one type of procedure for one class and a different type for another." *Dohany v. Rogers*, 281 U. S. 362, 369 (50 SC 299, 74 LE 904) (1930). Therefore, the co-defendants' argument fails on this basis.

Moreover,

> [t]here are . . . valid reasons for discriminating between the peremptory challenges of single defendants and codefendants. . . . [T]he reason is based upon the different problems involved in obtaining jurors. To allow each codefendant the full number of peremptory challenges would frequently cause undue delay and needless burden upon the public. As pointed out in *State v. Reed*, 47 N.H. 466 (1867): "If ten or twenty men were indicted for a misdemeanor, like a riot, and each had his two peremptory challenges, a larger attendance of jurors would be required than in a capital trial." Other courts also have recognized that if codefendants were given the full number of personal challenges, it would not only be inconvenient, but difficult to obtain juries. In fact, it would require the presence of an impractical number of jurors. *State v. Sutton*, 10 R.I. 159 (1872); *State v. Cady*, 80 Me. 413 (14 A. 940) (1888); *Schwartzberg v. United States*, 241 F. 348 (1917). The same reasons apply here.

*State v. Persinger*, 62 Wash2d 362, 369 (382 P2d 497) (1963).

For all of these reasons, the co-defendants have failed to show that OCGA § 17-8-4 (b) violates their rights to equal protection.

3. Both co-defendants contend that the trial court erred by failing to strike two jurors for cause. In both cases, the defendants

contend that the trial court improperly rehabilitated the jurors. We have reviewed the voir dire testimony of both jurors, however, and in each case, it is clear that the juror had not formed an opinion on the guilt or innocence of either defendant that was so fixed and definite that he or she would be unable to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence. *Ros v. State*, 279 Ga. 604 (4) (619 SE2d 644) (2005). See *Pitts v. State*, 260 Ga. App. 553 (5) (b) (580 SE2d 618) (2003) (trial court does not abuse its discretion by inquiring into juror's ability to be fair and impartial but may not rely on insufficient rehabilitative questions to reject clear evidence of potential juror's bias). See also *Kim v. Walls*, 275 Ga. 177 (563 SE2d 847) (2002) (rehabilitating potential jurors in civil case). There was no error.

4. Dixon separately maintains that the trial court erred by admitting evidence of a similar transaction in which he committed a battery against an acquaintance while under the influence.

> Before evidence of prior crimes is admissible, the trial court must determine that the State has affirmatively shown that: (1) the State seeks to admit evidence of the independent offenses or acts for an appropriate purpose; (2) there is sufficient evidence that the accused committed the independent offenses or acts; and (3) there is sufficient connection or similarity between the independent offenses or acts and the crimes charged so that proof of the former tends to prove the latter.

*Palmer v. State*, 271 Ga. 234, 239 (8) (a) (517 SE2d 502) (1999). See also Uniform Superior Court Rule 31.3 (B).

As an initial matter, it does not appear that Dixon has preserved this enumeration of error. Although he objected to the similar transaction evidence at a pre-trial hearing conducted pursuant to Uniform Superior Court Rule 31.3 (B), he raised no objections when any of the evidence was elicited during trial, as he was required to do to preserve the issue on appeal. *Young v. State*, 269 Ga. 478, 479 (3) (499 SE2d 60) (1998). Moreover, even if Dixon had preserved his argument, the similar transaction evidence was properly admitted. First, the similar transaction evidence was properly submitted to show Dixon's bent of mind and course of conduct. Second, the arresting officer testified that he witnessed Dixon committing the act, and third, the prior act showed that Dixon, whom the arresting officer suspected of being under the influence, violently attacked an acquaintance as the result of a minor disagreement. The officer testified at trial that he discovered Dixon beating his friend under an interstate highway bridge while he stumbled like he was under the

influence of something. The fight apparently began because Dixon's friend told Dixon that "he didn't have any Cherokee Indian in him." Therefore, the prior act qualified as a similar transaction.

5. Holodick separately argues that the trial court erred by (a) limiting the scope of his closing argument and (b) finding that his attorney did not render ineffective assistance by improperly interfering with his right to testify at trial.

(a) Holodick contends that the trial court impermissibly limited the scope of his closing argument by preventing him from referring to another recent local case in which a defendant had been convicted on circumstantial evidence but later cleared after DNA testing. Holodick wished to analogize to the case to emphasize the limitations of circumstantial evidence.

> Analogizing a defendant or a defendant's case to another well-known defendant or case is permissible during argument if the analogy is supported by facts in evidence. See *Robinson v. State*, 257 Ga. 194 (4) (357 SE2d 74) (1987). We have long held that counsel may make use of "well-established historical facts in his argument and make full use of illustrations as long as he does not introduce 'extrinsic and prejudicial matters' which have no basis in the evidence in the case." Id. Thus, we have found a prosecutor's references to well-known individuals, like Charles Manson and Jim Jones, to illustrate how an individual may obtain control of another, are within the wide latitude allowed in closing argument, provided there is an evidentiary basis for these illustrations. *Robinson*, supra at 196 (4).

*Carr v. State*, 267 Ga. 547, 555 (7) (a) (480 SE2d 583) (1997). Here, Holodick has provided no evidence that the case he wished to analogize to in closing argument was either so well-known or so well-established that it would fall within the rule cited above. As such, he has failed to sufficiently support his enumeration of error. In any event, however, Holodick was not prevented from arguing about the limitations of circumstantial evidence in his closing argument. Therefore, he suffered no harm.

(b) Holodick contends that his trial counsel rendered ineffective assistance by interfering with his right to testify at trial. The record shows no such interference. To the contrary, both of Holodick's trial counsel informed him that, although he had an absolute right to testify, they believed that it was in his best interest not to testify at trial based on a number of strategic reasons. In addition, the trial court thoroughly instructed Holodick regarding his right to testify at

two different times. Holodick's attorneys did not prevent Holodick from testifying, and Holodick knew that it was ultimately his decision. Based on the reasonable advice of counsel that it was not in his best interest to testify, Holodick voluntarily chose not to do so.

Based on these facts, Holodick has not shown that the performance of his trial counsel was deficient. See *Lupoe v. State*, 284 Ga. 576 (3) (d) (669 SE2d 133) (2008).

*Judgments affirmed. All the Justices concur.*

DECIDED APRIL 28, 2009.

*David C. Butler*, for appellant (case no. S09A0222).
*Mitchell D. Durham*, for appellant (case no. S09A0223).
*Patrick H. Head, District Attorney, Dana J. Norman, Assistant District Attorney, Thurbert E. Baker, Attorney General, Reggie A. Lampkin, Assistant Attorney General*, for appellee.