S01P0660. McPHERSON v. THE STATE.
(553 SE2d 569)

CARLEY, Justice.

A jury found Mark McPherson guilty of malice murder, financial transaction card theft, and two counts of theft by taking. For the murder, the jury recommended the death penalty, finding the following aggravating circumstances: the offense of murder was committed while McPherson was engaged in the commission of an aggravated battery on the victim; the offense of murder was committed by McPherson for the purpose of receiving money or other things of monetary value; and the offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind and an aggravated battery to the victim before death. OCGA § 17-10-30 (b) (2), (4), (7). McPherson's motion for new trial was denied. The case is before us for mandatory review pursuant to OCGA § 17-10-35 and the Unified Appeal Procedure.[1] *Colwell v. State*, 273 Ga. 338, 339 (2) (543 SE2d 682) (2001).

---

[1] The victim was murdered on March 11, 1998, and on April 24, 1998, the Floyd County Grand Jury indicted McPherson for malice murder, financial transaction card theft, two counts of theft by taking, and two counts of recidivism. The State filed its notice of intent to seek the death penalty the same day the indictment was handed down. The State dropped the recidivism counts before trial. The trial began on September 11, 2000, and the jury found McPherson guilty of all remaining counts on September 20, 2000. The jury recommended a death sentence for the murder on September 22, 2000 and, on the same day, the trial court entered the judgments of conviction and, in addition to the death sentence, imposed concurrent sentences totaling fourteen years. McPherson filed a motion for new trial on October 18, 2000, and amended it on January 3, 2001. The trial court denied the motion on January 11, 2001. This case was docketed in this Court on January 25, 2001 and orally argued on April 17, 2001.

*General Grounds*

1. The evidence adduced at trial authorized the jury to find the following: Linda Ratcliff met McPherson while they both worked at a cafeteria-style restaurant. The two dated for several months, and in February 1998 they moved into a mobile home together. Ms. Ratcliff was 56 years old and had been widowed in 1996; McPherson was 33 years old. McPherson was a drug addict, and he stole and pawned several of Ms. Ratcliff's possessions in order to get money for drugs. At Ms. Ratcliff's insistence, McPherson checked into a residential drug treatment center on March 8, 1998, for a five-day in-patient program, but he checked himself out after only two days and against medical advice. On March 11, Ms. Ratcliff went to work and told two friends that she had decided to leave McPherson that night because he kept stealing from her. That same day, McPherson, who had stopped going to work, stole and pawned Ms. Ratcliff's stereo and placed a telephone call to his drug dealer. At 8:30 p.m. on March 11, McPherson picked up Ms. Ratcliff from work in her car.

On March 16, 1998, after Ms. Ratcliff had not shown up at work for five days, a co-worker and her husband drove to Ms. Ratcliff's mobile home park and prevailed upon the park security employee to unlock her trailer door. They found Ms. Ratcliff's body inside the trailer and called the police. Ms. Ratcliff was wearing the same clothes which she had been wearing when she left work on March 11. The contents of her stomach were consistent with the meal she had eaten at 7:30 p.m. on March 11, and the medical examiner testified that based upon the expected rate of digestion she had died between 9:00 and 11:00 p.m. on March 11. The medical examiner further testified that she had received at least 20 blunt force blows to the face and head, including a dozen wounds that had resulted in skull fractures. Some of these blows were consistent with being caused by a hammer, and the force of these blows had driven pieces of skull into her brain. There were additional defensive wounds on her arms and legs. Based on the blood spatter on the victim and on the walls and floors, Ms. Ratcliff had been standing or sitting during part of the assault, which had apparently begun in the entry foyer and continued into her bedroom where her body was found. The medical examiner also determined from bruises and damaged neck cartilage that she had been manually choked. The police found a bloody ball peen hammer in the kitchen trash can, a bloody ball cap in another trash can, and bloody pants, shirt, and jacket in a bedroom identified as McPherson's. DNA testing confirmed that the victim's blood was on the hammer and shirt; witnesses further identified the blood-stained cap and jacket as items frequently worn by McPherson. Water-diluted bloodstains in a sink indicated that the assailant had washed

after the assault. Ms. Ratcliff's car, cell phone, credit cards, and envelope of $100 bills were missing.

Mark Jones was McPherson's drug dealer. He testified that between 9:00 and 10:00 p.m. on March 11, 1998, McPherson arrived at his house and sold him Ms. Ratcliff's cell phone for $80. McPherson had pawned the same cell phone to Jones a month earlier, but had later returned and retrieved it. On March 11, however, McPherson told Jones that he would not need the phone back.

Ronnie Owens was a crack addict who was McPherson's friend. He testified that McPherson came by his house on the morning of March 12 and that they smoked crack cocaine. They then went and bought more crack in a street transaction. McPherson paid for the drugs with a $100 bill. They went to a local hotel, and McPherson gave Owens another $100 bill to rent them a room. Jones, the drug dealer, came to the hotel and sold McPherson crack cocaine for $400 in cash. While they continued to use drugs, McPherson told Owens that Linda was dead and that he had killed her. After they had consumed all of the drugs that Jones had sold them at the hotel, they drove to Marietta and Atlanta in Ms. Ratcliff's car, buying and consuming drugs along the way. When the cash ran out, McPherson used Ms. Ratcliff's credit cards to purchase electronics and groceries, which he would then sell on the street. Numerous receipts for her credit cards during this time reflect purchases of electronics, cigarettes, and food and bear McPherson's signature. Eventually, McPherson traded the victim's car for drugs. Owens' brother came to get Owens in Atlanta on March 17 and told him and McPherson that the Rome police were looking for someone. Owens' brother asked McPherson for his last name, and McPherson said it was Johnson. When the Atlanta police arrested McPherson on March 18, he also told them his name was Johnson.

The evidence was sufficient to enable a rational trier of fact to find proof beyond a reasonable doubt of McPherson's guilt of malice murder, financial transaction card theft, and two counts of theft by taking. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find beyond a reasonable doubt the statutory aggravating circumstances which supported the death sentence for the murder. *Jackson v. Virginia*, supra; OCGA § 17-10-35 (c) (2). Since the evidence was sufficient to support the jury's finding of these statutory aggravating circumstances, the trial court correctly denied the motion to quash the State's notice of intent to seek the death penalty. *Jackson v. Virginia*, supra.

*Pre-Trial Issues*

2. In July 1998, the trial court sua sponte issued a gag order to limit pre-trial publicity. In September 1998, the district attorney in a speech to the Rotary Club stated that three recent Floyd County murders were "violent to the extreme, definitely death penalty type cases." In an interview in January 1999, the district attorney attributed several recent murders to drugs. The local newspaper ran an article about this interview that included a discussion of McPherson's case and several other cases. However, the district attorney did not specifically mention or discuss McPherson's case in either instance. Her remarks to the Rotary Club and the newspaper only addressed the general topic of drugs and violent crime. McPherson filed a motion to disqualify the district attorney for violating the gag order and a hearing was held in March 2000. After reminding the parties to refrain from mentioning the case in any public forum, the trial court denied the motion and also refused to order a change of venue. There was no evidence that the district attorney had specifically mentioned McPherson's case, and the trial court ruled that the newspaper article and Rotary Club speech were too far removed from the time of the trial to possibly taint the jury pool. McPherson's trial did not take place until September 2000, about 20 months after the news article. We conclude that the trial court did not err, because there was not any valid basis for disqualifying the district attorney or any evidence that the trial setting was made inherently prejudicial. See OCGA § 15-18-5 (a); *Barnes v. State*, 269 Ga. 345 (2) (496 SE2d 674) (1998).

3. McPherson contends that an additional reason why the trial court erred by refusing to disqualify the district attorney's office is that one of McPherson's original attorneys was hired as an assistant district attorney. In November 1998 John McClellan was appointed to assist counsel retained by McPherson's family. McClellan accepted employment as an assistant district attorney in June 1999, and new counsel was immediately appointed to represent McPherson. At the hearing on this issue in March 2000, McClellan testified that he never discussed McPherson's case with anyone at the district attorney's office and that he was shielded from any involvement in the prosecution of McPherson. In fact, McPherson's lawyer conceded that there was no evidence of any improper disclosure by McClellan. The trial court further determined that McPherson could not be harmed because "this case essentially started back at Ground Zero" when new appointed counsel was brought into the case. We conclude that the trial court correctly denied the motion to disqualify the district attorney's office. See *Lyons v. State*, 271 Ga. 639 (2) (522 SE2d 225) (1999); *Pruitt v. State*, 270 Ga. 745 (19) (514 SE2d 639) (1999).

4. McPherson claims that the trial court violated his Sixth Amendment right to counsel by appointing attorneys to represent him even though he was already represented by retained counsel. Shortly after his arrest, McPherson's family hired Robert Pope to represent him. After McClellan was hired by the district attorney, the trial court appointed James Wyatt and William Newton to represent McPherson. Neither McPherson nor his retained counsel objected to this arrangement before or during trial. *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992) ("Errors not raised in the trial court will not be heard on appeal."). Moreover, the trial court's express purpose for appointing additional counsel for McPherson was to ensure that he was represented by counsel experienced in death penalty cases. Although Pope had been an attorney for seventeen years and had tried several murder cases, he had no death penalty experience. Pope continued to represent McPherson with appointed counsel and assisted them at trial. We conclude that the trial court did not err by ensuring that McPherson was adequately represented. See Unified Appeal Procedure Rule II (A); *Lynd v. State*, 262 Ga. 58 (9) (a) (414 SE2d 5) (1992).

*Jury Selection*

5. On the first day of voir dire, the prosecutor asked some prospective jurors whether they believed a defendant was more or less responsible for his actions if on drugs or trying to obtain drugs. At the beginning of the second day of voir dire, McPherson objected to this question, and the prosecutor agreed to rephrase it so as to ask whether the prospective juror can follow the law that states that someone voluntarily using mind-altering drugs is as responsible for their actions as someone not on drugs. On appeal, McPherson complains that the trial court committed reversible error by allowing the prosecutor to ask the original question on the first day of voir dire, but concedes that he did not object to the question until the second day. In fact, McPherson's counsel stated at trial that they deliberately did not object to the prosecutor's drug question on the first day by saying, "[T]he reason we let it go yesterday from a strategic standpoint I like to look at [the jurors'] reactions and see what their reactions are." Even assuming that the original question was improper, a party during trial cannot deliberately ignore what he perceives to be error and then complain on appeal. *Pye v. State*, 269 Ga. 779 (14) (505 SE2d 4) (1998); *Warbington v. State*, 267 Ga. 462 (2) (479 SE2d 733) (1997). We find no error.

6. McPherson urges that the trial court erred by refusing to excuse for cause four prospective jurors.

(a) *Prospective Juror Clairy.* Mr. Clairy was a former police

officer who would tend to give more credence to a police officer's testimony. However, Clairy had only been a police officer from 1979 to 1982, and he knew nothing about McPherson's case and he did not know any of the witnesses. Clairy said that he would follow the judge's instructions, that he was not predisposed to any verdict, and that he would consider only evidence presented in the courtroom. We conclude that the trial court did not abuse its discretion by finding that Clairy was qualified to serve. See *Raulerson v. State*, 268 Ga. 623 (4) (491 SE2d 791) (1997) (not error to refuse to excuse for cause prospective jurors who express a belief in the credibility of police witnesses); *Brown v. State*, 268 Ga. 354 (3) (490 SE2d 75) (1997); *Garland v. State*, 263 Ga. 495 (1) (435 SE2d 431) (1993) (whether to excuse a prospective juror for cause lies within the sound discretion of the trial court).

(b) *Prospective Juror Mathews.* Ms. Mathews was a friend of the manager of the restaurant where both the defendant and the victim had worked, and she admitted to having had a conversation about the case with her friend around the time of the homicide. Ms. Mathews, however, did not remember any specifics about that conversation or the case, and she had not known the defendant or the victim. She did not remember either of their names. She said that she had not formed an opinion about the defendant's guilt or innocence and that she could decide the case based solely on the evidence presented in court. The trial court did not abuse its discretion by finding that she was qualified. See *Garland v. State*, supra.

(c) *Prospective Jurors Carlisle and Williams.* Mr. Carlisle was a corrections officer, not a law enforcement officer, and he had no general arrest power. Therefore, he was not subject to an excusal for cause due to his employment. See *Scruggs v. State*, 227 Ga. App. 35 (1) (488 SE2d 110) (1997) (corrections officers not subject to an automatic excusal for cause). Compare *Terrell v. State*, 271 Ga. 783 (1) (523 SE2d 294) (1999). The trial court also did not err by finding that Prospective Juror Williams could vote to impose all possible sentences and that she understood her role as a juror. See *Greene v. State*, 268 Ga. 47, 48-50 (485 SE2d 741) (1997); *Garland v. State*, supra. We find no error.

7. McPherson claims that the State hindered his ability to conduct an adequate voir dire by failing to provide the full name of a State witness until after voir dire was completed. Regardless of whether the defense actually had the full name of the witness before trial as maintained by the State, any confusion was resolved before the jury was struck when it was clarified that her name was Michael Nelson. At McPherson's request, the trial court asked the entire venire before jury selection whether anyone knew her, and there were no responses. McPherson could not have been harmed.

8. The trial court properly denied McPherson's motion to change venue because there was not extensive pre-trial publicity and few prospective jurors had heard about McPherson's case. See *Barnes v. State*, supra; *Jones v. State*, 267 Ga. 592 (1) (a) (481 SE2d 821) (1997). No prospective jurors were excused for cause due to bias resulting from pre-trial publicity. *Barnes v. State*, supra; *Jones v. State*, supra.

## The Guilt-Innocence Phase

9. The trial court did not err in admitting photographs of the victim at the crime scene and before autopsy. "Pre-autopsy photographs of a murder victim are generally admissible if they show the nature and extent of the wounds and the relation of the body to other crime scene evidence[.]" *Heidler v. State*, 273 Ga. 54 (6) (537 SE2d 44) (2000). See also *Wilson v. State*, 271 Ga. 811 (15) (525 SE2d 339) (1999). It was also not error to admit a photograph of the victim in life. See *Gissendaner v. State*, 272 Ga. 704 (7) (532 SE2d 677) (2000); *Ledford v. State*, 264 Ga. 60 (14) (439 SE2d 917) (1994).

10. McPherson complains that the trial court improperly allowed hearsay testimony under the necessity exception. OCGA § 24-3-1 (b). At trial, the State presented three friends of the victim who were her co-workers. Two of these witnesses testified over defense objection that Ms. Ratcliff had told them on March 11 that she was planning on leaving McPherson that night. The other witness testified that the victim told her on March 11 that she was moving out on the defendant that weekend. "To satisfy the necessity exception to the hearsay rule, the proponent must show a necessity for the evidence and a circumstantial guaranty of the statement's trustworthiness." *Morrow v. State*, 272 Ga. 691 (9) (532 SE2d 78) (2000). See also *Perkins v. State*, 269 Ga. 791 (4) (505 SE2d 16) (1998). Ms. Ratcliff was deceased and obviously unavailable to testify. The trial court also determined that her statements to others about her intended breakup with McPherson were relevant to establish motive for the murder. See *Morrow v. State*, supra; *Clark v. State*, 271 Ga. 6 (5) (515 SE2d 155) (1999). No other evidence of Ms. Ratcliff's intentions on March 11 is more probative on this point than what she told her friends. *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998). See *Morrow v. State*, supra; *Clark v. State*, supra. The circumstantial guaranty of trustworthiness was shown by the testimony of all three women that they were close friends with the victim, who routinely confided in them with respect to her personal life. All three witnesses knew McPherson and were familiar with the details of Ms. Ratcliff's turbulent relationship with him. Their testimony was further corroborated by a note in Ms. Ratcliff's handwriting that the police found in McPherson's bedroom, which stated in part, "You broke your promise two or three times . . .

so I don't have to hold to mine. . . . I don't want to give up on you but the price is too high not to." Since there was a necessity for the hearsay statements and a guaranty of their trustworthiness, they were properly admitted. See *Morrow v. State*, supra; *Perkins v. State*, supra.

11. When answering a question about Ms. Ratcliff's comments about moving out on McPherson, one of her friends gratuitously added that Ms. Ratcliff had said that she "was scared" of McPherson. Defense counsel objected and moved for a mistrial, and the trial court sustained the objection and issued curative instructions requiring the jury to disregard the remark in question. McPherson argues on appeal that the trial court should have granted the motion for a mistrial. However, " '[t]he granting of a motion for a mistrial is within the discretion of the trial court, and the trial court's ruling will not be disturbed when the trial court has taken remedial measures sufficient to ensure a fair trial.' [Cits.]" *Carruthers v. State*, 272 Ga. 306, 314 (7) (528 SE2d 217) (2000). We conclude that the trial court's curative instructions were sufficient to cure any harm that may have resulted from the remark, assuming that it was improper. See *Carruthers v. State*, supra; *Ward v. State*, 271 Ga. 648 (2) (520 SE2d 205) (1999) (not error to admit hearsay under the necessity exception that the murder victim had stated that she was "scared for her life" hours before she was killed by her boyfriend).

12. A photograph of the victim's body at the crime scene depicted her pockets as having been turned inside out and several sugar packets on the floor near one of the pockets. Another photograph of the crime scene showed the contents of a trash can, which contained a used Styrofoam coffee cup, a plastic spoon, and three sugar packets. In an apparent attempt to show that the killer of the victim had not been McPherson, defense counsel presented five witnesses in the guilt-innocence phase to testify that McPherson was a heavy coffee drinker who drank his coffee black. In rebuttal, the State presented a police officer who brought with him two of the sugar packets from the trash can to show that, in addition to being stained with blood, the sugar packets had not been opened. On appeal, McPherson argues that the officer's testimony was an "attempt to mislead the jury" because there was a third sugar packet and a plastic spoon in the trash can that had not been brought to court. However, McPherson did not object to this testimony at trial, and he has therefore waived this argument on appeal. *Earnest v. State*, supra. Moreover, McPherson cross-examined the officer on this point, and the credibility of witnesses and other evidence is for the jury to decide. *Jones v. State*, 272 Ga. 154 (1) (527 SE2d 543) (2000) ("[I]t [is] for the jury to assess the credibility of the witnesses, resolve any conflicts in the evidence, and arrive at a determination of the facts."); *Bowden v. State*, 270 Ga.

19 (4) (504 SE2d 699) (1998). We find no error.

13. The trial court did not err by refusing to charge the jury on involuntary intoxication, because there was no evidence adduced at trial to support such a charge. See *Collins v. State*, 191 Ga. App. 289 (6) (381 SE2d 430) (1989).

14. While charging the jury on the definition of reasonable doubt, the trial court stated, "But, if that doubt does not exist in your mind as to the guilt of the defendant, you should convict the defendant." We have discouraged the use of a jury instruction that suggests to the jury that it has a "duty to convict" in the absence of reasonable doubt. *Monroe v. State*, 272 Ga. 201 (3) (528 SE2d 504) (2000). Although we have not found the use of such a charge to be reversible error, the better practice is for the trial court to instruct the jury that it is "authorized to convict" in the absence of reasonable doubt. *Monroe v. State*, supra. In this case, the trial court did in fact use the language "authorized to find the defendant guilty" when instructing the jury on its findings for each specific count of the indictment if it did not have reasonable doubt on that count. We therefore conclude that the trial court's single "should convict" sentence in the charge does not constitute reversible error. See *Monroe v. State*, supra.

*The Sentencing Phase*

15. The State presented two witnesses who worked for separate mental health facilities that perform substance abuse detoxification. One witness testified that McPherson checked into detox in 1988, but he insisted on leaving the program before he had completed it. The second witness testified that McPherson checked into detox at her facility in 1995, but left a few days later against medical advice. On appeal, McPherson argues that this evidence was improper in the sentencing phase because it constituted bad character evidence. However, reliable evidence of a defendant's bad character is admissible in the penalty phase. *Wilson v. State*, supra at 822-823 (20); *Ford v. State*, 257 Ga. 461 (1) (360 SE2d 258) (1987). McPherson's repeated refusal to complete treatment for his drug addiction was therefore admissible, especially since drugs were an important part of the events that led to the victim's murder. See *Wilson v. State*, supra; *Ford v. State*, supra.

16. Both of McPherson's prior convictions for burglary were valid and properly admitted in the sentencing phase as non-statutory aggravating evidence. See *Mize v. State*, 269 Ga. 646 (15) (501 SE2d 219) (1998); *Pope v. State*, 256 Ga. 195 (17) (345 SE2d 831) (1986). See also *Nash v. State*, 271 Ga. 281, n. 1 (519 SE2d 893) (1999) ("*Pope* remains the controlling authority as to the admission of guilty pleas in the sentencing phase of death penalty cases.").

17. The victim-impact evidence was not improper. See OCGA § 17-10-1.2 (b); *Pickren v. State*, 269 Ga. 453 (1) (500 SE2d 566) (1998); *Simpkins v. State*, 268 Ga. 219 (3) (486 SE2d 833) (1997).

18. McPherson called four jailers as mitigation witnesses. They generally testified that McPherson was a quiet inmate who obeyed orders. In rebuttal, the State called a jailer who testified that McPherson became angry with her over having to wear leg restraints while seeing his lawyer at the jail and that he gave her a "hard, cold, dead look." The manager of the restaurant where both the victim and McPherson had worked also testified that McPherson became angry with her once and shook a butcher knife at her while giving her a "weird look." This rebuttal testimony was not improper. See generally *Kolokouris v. State*, 271 Ga. 597 (3) (523 SE2d 311) (1999); *King v. State*, 264 Ga. 502 (2) (448 SE2d 362) (1994).

19. McPherson contends that it was error for the State, during closing argument, to display a photograph of the victim in life that had been admitted at trial. The trial court, while overruling the defense objection, correctly stated, "This is evidence in the case. The jury is entitled to consider the evidence and the district attorney may talk about the evidence in the case." See *McCord v. State*, 268 Ga. 842 (4) (493 SE2d 129) (1997); *Brown v. State*, supra at 360 (8) (counsel in closing argument has a right to comment on the evidence).

20. It is well-settled that the trial court does not err by refusing to charge the jury on residual doubt since the trial court is not required to identify specific mitigating circumstances in the charge. *Heidler v. State*, supra at 65 (20); *Jenkins v. State*, 269 Ga. 282, 296 (25) (498 SE2d 502) (1998). The trial court in this case properly charged that the jury should consider mitigating circumstances in general, and that it could impose a life sentence for any reason or without any reason. See *Heidler v. State*, supra; *Jenkins v. State*, supra at 295-296 (24). The three parts of the second component of the OCGA § 17-10-30 (b) (7) aggravating circumstance were improperly listed on the verdict form as separate aggravating circumstances. *Carruthers v. State*, supra at 311 (3) (b). However, there was no harm to McPherson because the jury found two other statutory aggravating circumstances. See *Jenkins v. State*, supra at 294 (23) (a).

21. McPherson's death sentence was not imposed as the result of passion, prejudice or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The jury was authorized to find in this case that McPherson brutally assaulted a woman who had tried to help him, smashing in her skull with a hammer and choking her, in order to get money for drugs. The similar cases listed in the Appendix support the imposition of the death penalty in this

case, in that they all involve a murder committed for financial gain or a murder involving the OCGA § 17-10-30 (b) (7) aggravating circumstance.

*Judgments affirmed. All the Justices concur.*

APPENDIX.

*Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Gissendaner v. State*, 272 Ga. 704 (532 SE2d 677) (2000); *Perkins v. State*, 269 Ga. 791 (505 SE2d 16) (1998); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Todd v. State*, 261 Ga. 766 (410 SE2d 725) (1991); *Wade v. State*, 261 Ga. 105 (401 SE2d 701) (1991); *Jefferson v. State*, 256 Ga. 821 (353 SE2d 468) (1987); *Conner v. State*, 251 Ga. 113 (303 SE2d 266) (1983); *Smith v. State*, 249 Ga. 228 (290 SE2d 43) (1982); *Hance v. State*, 245 Ga. 856 (268 SE2d 339) (1980).

DECIDED OCTOBER 1, 2001 —
RECONSIDERATION DENIED NOVEMBER 5, 2001.

*James C. Wyatt, William H. Newton III*, for appellant.
*Tambra P. Colston, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General*, for appellee.