S02P0643. TERRELL v. THE STATE.
(572 SE2d 595)

FLETCHER, Chief Justice.

A jury convicted Brian Keith Terrell of malice murder and ten counts of forgery. The jury recommended a death sentence for the murder conviction based on three aggravating circumstances: (1)

murder committed while the defendant was engaged in an aggravated battery, (2) murder committed while the defendant was engaged in an armed robbery, and (3) murder that was outrageously or wantonly vile, horrible, or inhuman because it involved torture, depravity of mind, and an aggravated battery to the victim.[1] The trial court denied Terrell's motion for new trial, and he appeals.[2] Finding no reversible error, we affirm the convictions and sentences.

Approximately seven weeks after he was paroled from prison, Terrell shot and beat to death seventy-year-old John Watson to prevent Watson from reporting to the police that Terrell had forged Watson's signature on stolen checks totaling several thousand dollars. In addition to being a crime, stealing Watson's money violated the terms of Terrell's parole.

Watson lived alone and suffered from many health problems, including kidney difficulties that required dialysis three times a week. Terrell's mother, Barbara, had assisted Watson with meals and errands since 1989, and she had introduced Terrell to Watson.

On Saturday, June 20, 1992, Watson discovered ten checks with forged signatures, amounting to $8,700 in withdrawals. Three of the checks had been made out to Terrell, while the other seven checks were made out to one of Terrell's friends. Barbara Terrell identified her son's handwriting on some of the checks. Watson reported the forgeries to the police, but requested the opportunity to work the problem out with Barbara Terrell and her son. Because of his fondness for Barbara Terrell, Watson told her that, provided his money was returned on Monday, June 22, he would not take out an arrest warrant for Terrell. After being told about Watson's ultimatum, Terrell admitted that he had stolen the checks and promised to pay Watson by Monday. On Sunday June 21, however, Terrell told his mother that he did not have the money.

---

[1] OCGA § 17-10-30 (b) (2), (7).

[2] The murder occurred on June 22, 1992. The Newton County grand jury indicted Terrell for malice murder, felony murder, and armed robbery on July 13, 1992. The State dropped the felony murder and armed robbery counts after Terrell's first trial ended in a mistrial in the guilt-innocence phase. Terrell was indicted for ten counts of first degree forgery on June 10, 1993. Terrell's second trial on the malice murder and forgery charges resulted in conviction on all counts and a death sentence for the malice murder, but this Court reversed the convictions due to an error in jury selection. *Terrell v. State*, 271 Ga. 783 (523 SE2d 294) (1999). Terrell's third trial began on January 29, 2001, and the jury again convicted him on all counts. The jury recommended a death sentence for the murder on February 6, 2001. In addition to the death sentence, the trial court sentenced Terrell to ten consecutive ten-year sentences for the forgeries. Terrell filed a motion for a new trial on February 26, 2001, and an amended motion for new trial on July 3, 2001. The trial court denied Terrell's motion for a new trial on July 23, 2001, and he filed a notice of appeal on August 9, 2001. The case was docketed with this Court on January 14, 2002, and orally argued on April 15, 2002.

Around 11:00 a.m. the next morning, Monday, June 22, Barbara Terrell learned that Watson had not shown up for his morning dialysis appointment. She drove to his house, and with the help of a neighbor and the police, found Watson's body lying in the bushes. He had been shot four times and severely beaten in the face and head. The medical examiner testified that either the gunshots or the beating would have been fatal and that Mr. Watson had been alive while receiving all these injuries. The firearms expert, after examining the shell casings on the driveway and the bullets recovered from the victim, opined that the murder weapon was a .38 or .357 caliber revolver.

The crime scene evidence supported the following sequence of events. The assailant fired at Watson from the rear corner of the house when Watson was near the pickup truck and missed low with all of his shots, except one that ricocheted and struck Watson's leg. The assailant reloaded, dumping the spent shells on the driveway, chased Watson, knocked him down, shot him three more times while standing over him, and then dragged him into the brush and beat him with the revolver. To explain why the gunman would shoot low, the State introduced evidence that Terrell, who was right-handed, had a congenital defect of his right wrist that made it point downward.

Terrell's cousin, Jermaine Johnson, confessed that he and Terrell had been involved in Watson's murder. Johnson stated that he and Terrell checked into a motel near Watson's house on the night of June 21 and locked the keys in Terrell's car. Nobody else was with them. After unsuccessfully attempting to retrieve the car keys, they went to bed. They arose at 6:30 a.m. on June 22 and broke a window to get into the Cadillac. Johnson dropped Terrell off near Watson's house, and Terrell instructed Johnson to return at 9:00 a.m. Terrell had a .38 or .357 caliber revolver with him.

Johnson returned to pick up Terrell, and Terrell appeared nervous when he rejoined Johnson in the car. He still had the gun. The men went back to the motel and checked out. They went clothes shopping and then went home where Terrell bathed and Johnson washed the car. Terrell then went to the zoo. Later, Terrell told Johnson what had happened: he shot at and missed a man; the man tried to run; Terrell knocked him down, shot him, and then dragged him away. The police never recovered the murder weapon. Terrell told Johnson he "got rid of it at the zoo."

Other witnesses testified that they saw individuals matching Terrell or Johnson's descriptions that morning in the vicinity of Watson's house. Barbara Terrell testified that she saw Terrell and Johnson together at her house around 10:15 a.m. on the morning of June 22, and Terrell stated that he did not have Watson's money.

When initially questioned by the police, Terrell said that he and Johnson had checked into the motel and locked the keys in the car. They spent the evening with an unnamed woman, broke the window the following morning at 10:30 a.m., and checked out of the hotel. After the police arrested Terrell on June 24, he made a second statement. He repeated that an unknown woman was with them, but added that Johnson had taken her home early in the morning, which would have been impossible given his earlier statement that he and Johnson did not break the window to retrieve the keys until 10:30 a.m. When Terrell realized he had contradicted himself, he refused to answer any more questions.

1. Taking the evidence in the light most favorable to the verdict, a rational trier of fact was authorized to find beyond a reasonable doubt that Terrell was guilty of malice murder and ten counts of first-degree forgery.[3] The evidence also was sufficient to authorize the jury to find beyond a reasonable doubt the statutory aggravating circumstances that supported Terrell's death sentence.[4]

2. In the guilt-innocence phase, the trial court gave the jury the following charge on using a deadly weapon:

> [I]f a person of sound mind and discretion intentionally and without justification uses a deadly weapon or instrumentality in the manner in which the weapon or instrumentality is ordinarily used and thereby causes the death of a human being, you may infer the intent to kill.

Shortly after Terrell's trial, this Court held in *Harris v. State*[5] that the above charge was error. Because the direct review of Terrell's case was not completed at the time *Harris* was decided, he enjoys the benefit of that holding. The erroneous charge, however, does not require us to reverse Terrell's murder conviction.[6] Terrell's crime involved the ambush of a sick, elderly man in his driveway; the victim's death resulted from being repeatedly shot and beaten. Terrell's defense was that someone else committed the murder. There was no allegation of voluntary manslaughter or self-defense. Given the overwhelming evidence of malice, the improper charge was not reversible error.[7]

3. Terrell contends that the trial court erred when it prevented

---

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] Id.; OCGA § 17-10-35 (c) (2).

[5] 273 Ga. 608, 610 (543 SE2d 716) (2001).

[6] See *Austin v. State*, 275 Ga. 346, 347-348 (566 SE2d 673) (2002); *Harris v. State*, 274 Ga. 422, 426-427 (554 SE2d 458) (2001).

[7] See *Austin*, 275 Ga. at 347-348; *Harris*, 274 Ga. at 426-427; compare *Harris*, 273 Ga. at 610.

him from asking several voir dire questions to prospective jurors. Some of these questions improperly called for prejudgment of the case or asked prospective jurors what sentences were appropriate in hypothetical cases.[8] Other questions were irrelevant to a determination of the prospective jurors' impartiality or were recitations of the law in which the jury would be charged during the sentencing phase.[9] Additionally, Terrell's counsel was permitted to ask some questions that were initially disallowed after they were rephrased.

The trial court has discretion regarding the scope of voir dire.[10] Here, Terrell was permitted to ask sufficient questions to determine the fairness and impartiality of the prospective jurors.[11] Accordingly, there was no error.

4. Terrell raises two challenges to his death sentence based on the jury's deadlock over Terrell's guilt in an earlier trial for Watson's murder. First, he contends that double jeopardy bars his death sentence because the jury in an earlier trial deadlocked 9-3 in favor of conviction for malice murder. Second, he contends that imposing a death sentence after an earlier jury deadlocked on whether he was even guilty is a disproportionate punishment that is barred by this Court's prior cases. Neither contention has merit.

Terrell was initially tried on malice murder, felony murder, and armed robbery charges. The jury in that trial deadlocked on all charges. The State retried Terrell on the malice murder charge, dropped the felony murder and armed robbery charges, and added ten counts of forgery. The jury in the second trial convicted Terrell and sentenced him to death, but those convictions and sentences were reversed.[12] This appeal involves his third trial, in which Terrell was again convicted of malice murder and forgery and sentenced to death.

(a) Terrell contends that, because the first jury deadlocked over Terrell's guilt or innocence, it by definition failed to find the statutory aggravators that were used to support his death sentence, and double jeopardy bars any subsequent jury from finding statutory aggravators that the first jury did not find. Contrary to Terrell's position, double jeopardy does not bar Terrell's death sentence.

The Double Jeopardy Clause of the Fifth Amendment protects a

---

[8] See Carr v. State, 267 Ga. 547, 554 (480 SE2d 583) (1997) (improper to ask prospective juror to enumerate hypothetical circumstances where he or she might or might not vote to impose the death penalty); Crowe v. State, 265 Ga. 582, 588 (458 SE2d 799) (1995); Blankenship v. State, 258 Ga. 43, 45 (365 SE2d 265) (1988).

[9] See Gissendaner v. State, 272 Ga. 704, 709 (532 SE2d 677) (2000); Henderson v. State, 251 Ga. 398, 400-401 (306 SE2d 645) (1983).

[10] Barnes v. State, 269 Ga. 345, 351 (496 SE2d 674) (1998).

[11] Barnes, 269 Ga. at 351-352.

[12] Terrell, 271 Ga. 783-784.

defendant from the State's attempts to re-litigate the facts after an acquittal or to impose additional punishment after a conviction and sentence.[13] Double jeopardy does not prevent a retrial when a previous jury was hopelessly deadlocked over the defendant's guilt.[14]

In *Bullington v. Missouri*,[15] the United States Supreme Court held that double jeopardy precludes the State from seeking the death penalty after an appellate court reverses a case if the jury in the first trial had sentenced the defendant to life imprisonment. The Supreme Court reasoned that a bifurcated death penalty trial was really two separate trials and a verdict of life imprisonment in the sentencing "trial" amounted to an acquittal of the death penalty.[16] Here, the first jury did not adjudicate Terrell's sentence, or his guilt for that matter. Just as double jeopardy does not bar a second jury from adjudicating Terrell's guilt, double jeopardy does not prevent a second jury from adjudicating Terrell's sentence.

In *Miller v. State*,[17] this Court went beyond the facts presented in *Bullington* and held that, when a jury deadlocks in the penalty phase of a capital case, Georgia's death penalty statute requires the court to sentence the defendant to life imprisonment. Rather than relying upon the constitutional prohibition against double jeopardy, however, the holding in *Miller* was based on this Court's interpretation of Georgia's death penalty sentencing statute.[18] The death penalty statute at issue in *Miller* provided that the trial court shall sentence the defendant to death if the jury, after the defendant's conviction, finds beyond a reasonable doubt one or more statutory aggravating circumstances and recommends a death sentence; if the jury does not make the finding or recommendation, the trial court shall sentence the defendant to life imprisonment.[19] This Court concluded that a jury deadlock in the penalty phase meant that the jury had failed to make a sentencing recommendation and the judge, therefore, was statutorily required to impose a sentence of life imprisonment.[20] Unlike *Miller*, the jury in Terrell's first trial did not reach the penalty phase and, thus, was not called on to decide Terrell's sentence under the death penalty statute. Accordingly, *Miller* is inapplicable.

(b) Prior to the United States Supreme Court's *Bullington* deci-

---

[13] See *Perkinson v. State*, 273 Ga. 491, 494 (542 SE2d 92) (2001).

[14] *Griffin v. State*, 264 Ga. 232, 233 (443 SE2d 612) (1994).

[15] 451 U. S. 430 (101 SC 1852, 68 LE2d 270) (1981).

[16] Id. at 444-446.

[17] 237 Ga. 557, 558-559 (229 SE2d 376) (1976).

[18] *Miller*, 237 Ga. at 558-559; see also *Hill v. State*, 250 Ga. 821, 821-822 (301 SE2d 269) (1983).

[19] Id.; see also OCGA § 17-10-31.

[20] *Miller*, 237 Ga. at 558-559; *Hill*, 250 Ga. at 821-822.

sion this Court held in *Ward v. State*[21] that, once the jury sentences a defendant to life imprisonment, a sentence of death in any subsequent retrial is disproportionate. Terrell contends that, under the reasoning of *Ward*, his current death sentence is disproportionate because the first jury could not decide upon Terrell's guilt, much less whether he should die for his crimes. OCGA § 17-10-35 (c) (3) is a comparative sentencing statute that requires this Court to determine whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Under this provision, the Court will set aside a sentence of death that is "substantially out of line" with sentences imposed for similar crimes.[22] The Court's focus is on "how prior *sentencers* have responded to acts similar to those committed by the defendant whose case is being reviewed."[23]

The jury at Terrell's first trial never considered Terrell's sentence, much less imposed one, because it could not agree on his guilt. Terrell's argument would take the Court's statutory duty to ensure comparative sentencing and extend it to encompass juries' reactions to comparable evidence in other cases. Terrell's position reads more into the statute than exists, and we decline to convert the comparative sentencing review of OCGA § 17-10-35 (c) (2) into a comparative trial review. Because the jury in Terrell's first trial never considered what sentence should be imposed on Terrell, the jury's actions in that first trial are not considered in determining whether his current death sentence is disproportionate to sentences for other, similar crimes involving a similar defendant. Accordingly, we find that the jury's deadlock on Terrell's guilt in his first trial does not render his current death sentence disproportionate.

5. Terrell submits that the State's failure to list in the indictment the statutory aggravators that were used to support his death sentence violates his constitutional rights. Terrell points to the following language from the recent United States Supreme Court opinion in *Apprendi v. New Jersey*[24] to support his position: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be *charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt. The Fourteenth Amendment commands the same answer in this case involving a state statute."[25] Rather than alleging

---

[21] 239 Ga. 205 (236 SE2d 365) (1977).

[22] *Coley v. State*, 231 Ga. 829 (204 SE2d 612) (1974).

[23] *Ross v. State*, 233 Ga. 361, 366 (211 SE2d 356) (1974) (emphasis supplied).

[24] 530 U. S. 466 (120 SC 2348, 147 LE2d 435) (2000).

[25] *Apprendi*, 530 U. S. at 476 (citation omitted; emphasis supplied).

the statutory aggravating circumstances in the indictment, the State provided Terrell notice of which statutory aggravators it was going to rely upon in its notice of intent to seek the death penalty.

Under Georgia law, the State is not required to allege the statutory aggravating circumstances in the indictment,[26] and it may provide a defendant notice of the statutory aggravators through other means, such as the written notice of intent to seek the death penalty that was filed in this case.[27] Therefore, the question becomes whether the federal constitution, as interpreted by the Supreme Court in its recent *Apprendi* decision, renders unconstitutional the Georgia procedure of listing the statutory aggravators that support a death penalty through means other than the indictment. We conclude that it does not.

*Apprendi* was the second of three recent Supreme Court cases addressing the ability of a trial court to use facts that had not been found by the jury beyond a reasonable doubt to increase the defendant's sentence beyond the maximum sentence that was authorized by statute for the crimes for which the jury had found the defendant guilty. The first of the trio was *Jones v. United States*,[28] involving the federal carjacking statute. *Apprendi* applied *Jones* to sentences imposed under state law. The most recent case was *Ring v. Arizona*,[29] in which the Court struck down Arizona's capital sentencing structure.

The holdings in the two cases involving state criminal sentences (*Apprendi* and *Ring*) are summed up by the following language from *Ring*: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt."[30] Both *Apprendi* and *Ring* focused on the role of the jury. Neither *Apprendi* nor *Ring* addressed whether notice of a fact that would be used to support a sentence had to be conveyed to the defendant through an indictment versus some other means.

Here, Terrell was put on notice that the State was seeking the death penalty and the statutory aggravators that would be used to support a sentence of death when the State filed several months before trial a renewed notice of intention to seek the death penalty. We conclude that Terrell was provided constitutionally sufficient

---

[26] See *Blankenship v. State*, 247 Ga. 590, 594 (277 SE2d 505) (1981) (overruled in part on other grounds by *Thompson v. State*, 263 Ga. 23 (426 SE2d 895) (1993)); see also *Bowden v. Zant*, 244 Ga. 260 (260 SE2d 465) (1979).

[27] Unified Appeal Procedure, Rule II (C) (1).

[28] 526 U. S. 227 (119 SC 1215, 143 LE2d 311) (1999).

[29] 536 U. S. 584 (122 SC 2428, 153 LE2d 556) (2002).

[30] *Ring*, 122 SC at 2439; see also *United States v. Matthews*, 312 F3d 652, 662 n. 12 (5th Cir. 2002).

notice of the State's intent to seek the death penalty and the statutory aggravating circumstances that it would rely on in seeking that sentence.

To the extent Terrell is arguing that the language from *Apprendi* regarding charging in an indictment requires a grand jury to consider the statutory aggravators, we find that contention also is without merit. The federal constitution's grand jury presentment clause does not apply to the states,[31] and *Apprendi* and *Ring* did not analyze whether the federal constitution requires a state grand jury to consider the statutory aggravating factors that support a sentence of death.[32] By indicting Terrell for malice murder, the grand jury authorized the State to seek any penalties that are authorized by statute for that crime, including the maximum penalty of death.[33] This Court has repeatedly rejected challenges to the legislature's determination that district attorneys should have the discretion to decide whether a murder defendant meets the statutory criteria for the death penalty and whether to pursue the death penalty when a defendant is eligible.[34] Nothing in *Apprendi* or *Ring* renders unconstitutional Georgia's system for bringing death penalty prosecutions to trial.

Finally, the most important point, insofar as *Apprendi* or *Ring* are concerned, is that a jury found beyond a reasonable doubt the existence of all three statutory aggravators that were in the State's notice of intention to seek the death penalty. That same jury recommended that Terrell be sentenced to death, and consistent with the jury's findings and recommendation, the trial court sentenced Terrell to death. Under these circumstances, we find there was no violation of Terrell's constitutional rights that are described in *Apprendi* and *Ring*, and the State was not under a constitutional obligation to place the statutory aggravators in the indictment.

6. During the guilt-innocence phase, the State called Raymond Graham to testify about inculpatory statements made by Terrell. Graham was serving a life sentence for a murder conviction. Graham testified that he had known Terrell "all [his] life" and that, before Watson's murder, Terrell approached him about participating in the robbery of Terrell's mother's employer. Graham testified that he

---

[31] See *Beck v. Washington*, 369 U. S. 541, 545 (82 SC 955, 8 LE2d 98) (1961); *Hurtado v. California*, 110 U. S. 516 (4 SC 111, 28 LE 232) (1884).

[32] *Ring*, 122 SC at 2437 n. 4 ("Ring does not contend that his indictment was constitutionally defective"); *Apprendi*, 530 U. S. at 477 n. 3 ("We . . . do not address the [Fourteenth Amendment] indictment question separately today.").

[33] OCGA § 16-5-1 (d).

[34] *Jenkins v. State*, 269 Ga. 282, 285 (498 SE2d 502) (1998); *McClain v. State*, 267 Ga. 378, 389 (477 SE2d 814) (1996); *Crowe v. State*, 265 Ga. 582, 595 (458 SE2d 799) (1995); see also *Gregg v. Georgia*, 428 U. S. 153, 199 (96 SC 2909, 49 LE2d 859) (1976) (Stewart, Powell, Stevens, JJ.) (rejecting constitutional challenge to prosecutors' discretion to choose when to pursue the death penalty against an indicted murder defendant).

declined because the planned robbery involved a murder and he "didn't want to participate." On cross-examination, Terrell's counsel questioned Graham about his felony murder conviction as well as other felony convictions. Graham admitted the convictions, and made no attempt to explain them. Terrell's counsel then began to question Graham about the details of the felony murder he had committed. The State objected that the details of Graham's 1994 murder conviction were not relevant, and the trial court sustained the objection.

A witness may be impeached by proof of conviction of a crime involving moral turpitude, but the details of that crime are not relevant unless the witness attempts to rehabilitate himself by explaining the circumstances of his conviction.[35] Had Graham's conviction been offered only to show that he was unworthy of belief because he was a convicted felon, then the details that led to that conviction would have been irrelevant.

Terrell argues, however, that he was attempting to show specifically that, contrary to Graham's testimony, Graham was not averse to murder. Although a witness may be impeached by disproving facts testified to by him, "a witness may not be impeached based upon a discrepancy relating to a wholly immaterial matter."[36] Whether Graham was averse to murder was not relevant to whether Terrell murdered Watson or stole his checks. The veracity of Graham's stated aversion to murder was relevant, if at all, to show that Graham was untruthful generally and his testimony should be disbelieved.

The proffer regarding the details of the crime that led to Graham's felony murder conviction does not impeach Graham's stated aversion to murder. According to Terrell, Graham was involved in the rape of a 78-year-old woman who subsequently died, but nothing in the record suggests what role Graham's rape may have played in the rape victim's death.

Finally, there was no evidence that Graham participated in Watson's murder or the theft and forgery of the checks.[37] Therefore, cases such as *Henderson v. State*[38] and *Walker v. State*[39] are inapplicable.

"[T]he trial court, in determining the scope of relevant cross-examination, has a broad discretion."[40] Based on the record in this case, we find that the trial court did not abuse its discretion in excluding the details of the crime that led to Graham's felony murder conviction.

---

[35] *Vincent v. State*, 264 Ga. 234, 235 (442 SE2d 748) (1994).

[36] *Brown v. State*, 260 Ga. 153, 156 (391 SE2d 108) (1990).

[37] Compare *Henderson v. State*, 255 Ga. 687 (341 SE2d 439) (1986).

[38] 255 Ga. 687.

[39] 260 Ga. 737 (399 SE2d 199) (1991).

[40] *Kolokouris v. State*, 271 Ga. 597, 600 (523 SE2d 311) (1999).

7. Terrell committed the murder in Newton County, but the trial court determined that a fair trial could not be held in that county due to pretrial publicity. Because the parties could not agree on a transfer county, the trial court selected Houston County.[41] After the mistrial of Terrell's Houston County trial, the trial court sua sponte transferred venue to Walton County, where Terrell was convicted and sentenced to death. To justify the second transfer, the trial court stated that Walton County is in the same judicial circuit as Newton County and, in addition to convenience, has a similar population and racial breakdown. The trial court also found that the main Newton County newspaper had a very limited circulation in Walton County, Terrell's case was several years old, and it was not generating media interest.

Terrell argues that the trial court erred by transferring venue to Walton County after the first trial. However, his allegation that he was prejudiced because the percentage of African-Americans in Walton County's population is 17% and the percentage of African-Americans in Newton County's population is 21% is without merit.[42] Additionally, the voir dire revealed that no prospective jurors knew about Terrell's case; indeed, only one prospective juror subscribed to the Newton County newspaper that had contained articles about the case. We conclude that the trial court did not abuse its discretion by transferring venue to Walton County because the trial setting was not prejudicial to Terrell.[43]

8. Georgia's statutory death penalty scheme is not unconstitutional, and prosecutors do not have unfettered discretion to seek the death penalty.[44] Terrell has not shown that the decision-makers in his case acted with any discriminatory purpose.[45]

9. Terrell also contends that this Court does not properly review sentences of death for proportionality, as required by OCGA § 17-10-35 (c) (3). This Court rejected a similar argument in *Gissendaner v. State*,[46] and nothing presented by Terrell supports reaching a contrary conclusion in this case.

10. With regard to the proportionality of Terrell's death sentence, the record reveals several aggravating factors. Terrell used his mother's relationship with a sick, elderly man, who Terrell described as like a father to him, to gain access to his house and belongings and steal his checkbook. He then forged $8,700 worth of checks, admitting at trial that he did not think the victim would go to the police

---

[41] See OCGA § 17-7-150 (a) (1).
[42] See *Gary v. State*, 260 Ga. 38, 41 (389 SE2d 218) (1990).
[43] See *Jenkins v. State*, 269 Ga. 282, 285-286 (498 SE2d 502) (1998).
[44] *McCleskey v. Kemp*, 481 U. S. 279 (107 SC 1756, 95 LE2d 262) (1987); *Gregg v. Georgia*, 428 U. S. 153; *Crowe v. State*, 265 Ga. 582, 595 (458 SE2d 799) (1995).
[45] See *Rower v. State*, 264 Ga. 323, 323 (443 SE2d 839) (1994).
[46] 272 Ga. 704, 716 (532 SE2d 677) (2000).

when he found out. Faced with an ultimatum to return the money or return to prison for violating his parole, Terrell plotted the victim's murder, ambushing the victim in his driveway as he was leaving for a dialysis appointment. Terrell shot and wounded the seventy-year-old victim, chased him as he tried to flee, knocked him down, and shot him three more times while standing over him. Terrell then dragged Watson into the bushes and beat and robbed him. Terrell had been released from prison the previous month, where he had been serving time for three convictions of robbery and three convictions of false imprisonment. Penalty phase evidence as to these prior convictions showed that in 1990 Terrell and several accomplices invaded an apartment and robbed three people at gunpoint, stealing drugs and a car. While awaiting trial for Watson's murder, Terrell told a police investigator that he was going to rape the investigator's daughter, and he started a fire in his cell block. The cases in the Appendix support the imposition of the death penalty in this case in that each involved a calculated, planned murder involving an armed robbery, an aggravated battery to the victim before death, or depravity of mind. Accordingly, Terrell's sentence of death is not disproportionate under OCGA § 17-10-35 (c) (3).

11. The death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor.[47]

*Judgment affirmed. All the Justices concur, except Benham, J., who concurs specially.*

### APPENDIX.

*McPherson v. State*, 274 Ga. 444 (553 SE2d 569) (2001); *Colwell v. State*, 273 Ga. 634 (544 SE2d 120) (2001); *Esposito v. State*, 273 Ga. 183 (538 SE2d 55) (2000); *Gissendaner v. State*, 272 Ga. 704 (532 SE2d 677) (2000); *Gulley v. State*, 271 Ga. 337 (519 SE2d 655) (1999); *Palmer v. State*, 271 Ga. 234 (517 SE2d 502) (1999); *Lee v. State*, 270 Ga. 798 (514 SE2d 1) (1999); *Cromartie v. State*, 270 Ga. 780 (514 SE2d 205) (1999); *Mize v. State*, 269 Ga. 646 (501 SE2d 219) (1998); *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Ledford v. State*, 264 Ga. 60 (439 SE2d 917) (1994); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1989).

FLETCHER, Chief Justice, concurring.
This Court's duty to determine whether a sentence of death is

---

[47] OCGA § 17-10-35 (c) (1).

disproportionate is imposed by statute, not the federal constitution.[48] Over time, the Court's procedures for ensuring that a sentence of death is reviewed for proportionality under OCGA § 17-10-35 (c) (3) have changed.[49] Although I believe that this Court's proportionality review satisfies the statutory requirements, I write separately to address further Terrell's contention that the Court's proportionality review does not satisfy OCGA § 17-10-35 (c) (3).

Our most recent explanation of our proportionality review was in *Gissendaner v. State*,[50] when the Court said, "[t]his Court views a particular crime against the backdrop of all similar cases in Georgia in determining if a given sentence is excessive per se or substantially out of line."[51] The Court, however, did not describe how it uses "the backdrop of all similar cases" to determine whether a sentence is "substantially out of line."

The Court reviews each sentence of death to determine whether there are other cases that have been appealed with similar facts in which the defendant was sentenced to death. These similar death penalty cases are cited in the Appendix to the Court's opinion. The Court does not determine whether the death sentence under review represents a large or small percentage of sentences in factually comparable cases. Rather, the Court examines the sentence on appeal to ensure that it is not an anomaly or aberration.

As a plurality of the United States Supreme Court recognized in *Gregg v. Georgia*,[52] at each stage of the criminal justice system, an actor "makes a decision which may remove a defendant from consideration as a candidate for the death penalty."[53] This discretion manifests itself in everything from the district attorneys' charging decisions to defendants who turn down plea offers to juries who grant the defendant life rather than death. By the time a murder case reaches this Court, many discretionary decisions by numerous actors have affected the outcome.

Perhaps the process for determining whether a sentence is disproportionate can be improved and, if so, then it should be done. However, I am not convinced at present that categorizing each murder case using different factors or sub-categories, as Terrell suggests, improves our overall goal of ensuring that a defendant's death sentence was not wantonly or freakishly imposed. Accordingly, as

---

[48] *Pulley v. Harris*, 465 U. S. 37 (104 SC 871, 79 LE2d 29) (1984).

[49] Compare *Ross v. State*, 233 Ga. 361, 366 (211 SE2d 356) (1974) with *Stephens v. State*, 237 Ga. 259, 262 (227 SE2d 261) (1976) with *Horton v. State*, 249 Ga. 871, 880 n. 9 (291 SE2d 685) (1982).

[50] 272 Ga. 704 (532 SE2d 677) (2000).

[51] 272 Ga. at 717.

[52] 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976).

[53] 428 U. S. at 199 (Stewart, Powell, Stevens, JJ.).

demonstrated by the vote in Division 9 of this case, I join the rest of the members of the Court in deciding that our current procedure satisfies the statutory mandate of OCGA § 17-10-35 (c) (3).

BENHAM, Justice, concurring specially.

While I concur with all else in the majority opinion, I must take issue with the conclusion in Division 5 of that opinion holding that the decision in *Apprendi v. New Jersey*, 530 U. S. 466 (120 SC 2348, 147 LE2d 435) (2000), does not render unconstitutional the Georgia procedure of listing the statutory aggravators that support a death penalty through means other than the indictment. The absence of the statutory aggravators from the indictment was error. However, "*Apprendi* error is susceptible to harmless error analysis. [Cit.]" *United States v. Matthews*, 312 F3d 652, 665 (5th Cir. 2002). Under the circumstances of the present case, I conclude that the error was harmless. I concur, therefore, in the judgment of affirmance.

DECIDED NOVEMBER 12, 2002 —
RECONSIDERATION DENIED DECEMBER 13, 2002.

*John T. Strauss*, for appellant.

*W. Kendall Wynne, Jr.*, District Attorney, *Alan A. Cook*, Assistant District Attorney, *Thurbert E. Baker*, Attorney General, *Paige R. Whitaker*, Assistant Attorney General, for appellee.