FOURTH DIVISION

September 18, 2003

No. 1-01-1936

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

) No. 95 CR 33433

)

WARDELL McCLAIN, ) Honorable

) Frank Zelezinski,

Defendant-Appellant. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

Following a third jury trial,
(footnote: 1) defendant Wardell McClain was convicted of first degree murder and was sentenced to an extended term of 80 years' imprisonment.  On appeal, defendant argues that (1) the trial court abused its discretion in denying his request for a continuance to bring in a witness, (2) the trial court improperly retroactively employed the recently amended version of section 5-8-2(a) of the Unified Code of Corrections (730 ILCS 5/5-8-2(a) (West 2000))
(footnote: 2) (Code of Corrections) to sentence him to an extended term, and (3) section 111-3(c-5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c-5) (West 2000)) (Criminal Procedure Code) violates article I, section 7, of the Illinois Constitution (Ill. Const. 1970, art. I, §7) because it allows the State to add elements of an offense by only giving written notification to the defendant.  For the reasons that follow, we affirm.

The evidence at trial established that at approximately 12:40 a.m. on October 18, 1995, Lieutenant Haynie of the Ford Heights police department stopped a car that was going the wrong way on East 16th Street and arrested the driver, Cecil McCool, on an outstanding warrant. Lieutenant Haynie then determined that the car was registered to the passenger, Richard Will, and that Will did not have a valid driver's license.  Accordingly, he told Will that the car would have to be towed because Will was unable to drive it without a license.  Lieutenant Haynie also told Will that he would have to find a way home and directed him to a public phone located approximately 1 1/2 blocks away.  While Lieutenant Haynie waited for the tow truck, he saw Will walking in the direction of where the telephone was located.

After Lieutenant Haynie returned to the police station, he received a call regarding a man being beaten and burned at 16th Street and Berkeley Avenue.  Upon arriving at the scene, Lieutenant Haynie saw a man lying in the street who had been beaten and whose head and groin were on fire.  Lieutenant Haynie recognized the man as Will.  As Officer Haynie called for an ambulance, he retrieved a charcoal lighter fluid bottle from approximately one foot away from Will and put it in the trunk of his car.  More than 50 people were gathered in the vicinity of where the incident occurred; however, when questioned, no one was cooperative.

Lieutenant Haynie testified that as soon as the ambulance arrived, the paramedics immediately applied a water solution to the victim because his groin was still on fire.  After paramedics loaded Will into the ambulance, Lieutenant Haynie escorted it to the Ford Heights city limits and then returned to the scene.  After performing a brief search, he recovered some underwear and a gym shoe that were by a Dumpster.

By October 19, 1995, the victim was deceased.  The investigation proceeded, and later that day, codefendant Michael Armstrong was present at the Ford Heights police station for questioning.  After conversing with Armstrong, Lieutenant Haynie, accompanied by Officer Hunter, went to the defendant's home and found that he was not present.  At approximately 8:15 p.m., Lieutenant Haynie and Officer Hunter returned to the defendant's home and the defendant's father, Samuel McClain (Mr. McClain), answered the door.  Officer Haynie explained to Mr. McClain that they needed to talk to the defendant about an incident in which a white man was burned at 16th Street and Berkeley Avenue.  Mr. McClain invited the officers inside and called the defendant into the room.  At that time, the defendant was 17 years old.  According to Lieutenant Haynie, defendant agreed to accompany the officers to the police station to answer questions, and Mr. McClain agreed that he could go.

At about 8:45 p.m., the police advised the defendant of his 
Miranda
 rights in a booking room at the police station, and defendant agreed to talk with the police.  Initially, the defendant stated that he "didn't know anything about a white guy being beaten and burned at 16th and Berkeley."  Lieutenant Haynie then left the room to speak with Armstrong for a few minutes, and then returned to the room to speak to the defendant.  Defendant then admitted to Lieutenant Haynie that he was present when the victim was beaten and burned and that he had taken part in the beating.  Lieutenant Haynie then contacted Assistant State's Attorney Frank Cece (ASA Cece), who was on duty that evening as a felony review assistant.

ASA Cece testified about the circumstances surrounding the defendant's statement.  ASA Cece arrived at the Ford Heights police station at approximately 1:30 a.m. on October 20, 1995, and immediately went with Lieutenant Haynie to speak to the defendant.  After ASA Cece had advised the defendant of his 
Miranda
 rights, defendant again admitted his involvement in the incident.  ASA Cece then explained the options of memorializing the defendant's statement, and the defendant chose to make a handwritten statement, but to have ASA Cece write it.  ASA Cece identified two Polaroid photographs of the defendant signing the statement.

According to the statement, around midnight on October 18, 1995, the defendant and his friends were hanging out in the area of 16th Street and Berkeley Avenue, an area known to the locals as "Vietnam."  The people with the defendant at that time were Michael Evans, Marvin Drumin, Lewis McDonald, Keith Clinton, and Michael Armstrong.  Defendant told ASA Cece that Evans was talking about the Million Man March and how he would beat up any white guys who showed up in Ford Heights.  At that time, defendant and Clinton were talking to some girls and Evans appeared and said that there was a white guy around the corner.  Thereafter, Evans, McDonald, Drumin, and Armstrong went around the corner, and the defendant followed.  When defendant walked over to where they were, he saw his other friends surrounding a "white dude" and asking him what he was doing there.  After the man responded that he was "waiting on some lady," Evans, McDonald, Armstrong and Drumin jumped on him and began punching and kicking him in the head, face and body.  Then, according to the defendant, Evans yelled "[b]itch, we are going to fuck you up.  There is going to be a riot between us blacks and you whites."

After that, the victim began hollering for help and yelled, "not again, not again."  Defendant told ASA Cece that it looked like somebody beat up the victim even before they had jumped him.  The hitting and kicking continued until the "white dude" fell to the ground.  The defendant saw Evans pull out a plastic bottle of lighter fluid from his jacket pocket and pour some of its contents on the victim's head and face.  Evans then used a match and "lit the guy's head on fire" while Drumin and McDonald kept punching him and kicking him.  As defendant related, "we just watched him burn until Armstrong put a shirt on the guy's head and put out the fire.  I stomped the white dude a couple of times with my foot while he was laying in the street still hollering on carrying on."  

The victim then got up and began stumbling towards a Dumpster, at which point Drumin kicked him "in the butt" and the victim hit the Dumpster head-first and yelled.  After that, McDonald kicked the "white dude" in the stomach.  Then, Evans poured even more lighter fluid on the "white dude's" neck and stomach.  Defendant stated: "Then [Evans] threw another match in the white dude, and he went up in flames pretty good.  The white dude stood there in the street all on fire with his hands up by his face.  None of us helped him.  We just watched him burn."  Moreover, he stated that "he knew that when they lit the white dude up again that they were going to kill him."

Defendant's father, Samuel McClain, passed away between defendant's second and third trials.  Accordingly, the testimony from Mr. McClain's testimony in the second trial was read to the present jury on the defendant's behalf.  Mr. McClain had testified that he was at his home at 1436 Embassy in Ford Heights at 11:30 p.m. on October 17, 1995.  He lived there with his wife, his grandson, his grandson's wife and the defendant.  Mr. McClain stated that at 11:30 p.m., the defendant knocked on the door and Mr. McClain saw his grandson let him in.  When the defendant came in the house, he walked past his father, went and spoke to his mother, and then went to the kitchen before going to his room.  Mr. McClain asserted that although he had gone to sleep on the couch, he would have known if anyone left the house and he knew that the defendant did not leave the house again until 8 a.m. the next morning.  Mr. McClain further testified that on October 20, 1995, he went to the police station and told Jack Davis, the Ford Heights chief of police, that defendant was home on the night of October 17.  Mr. McClain also testified that the defendant was "real slow," that he only weighed one pound when he was born, and that he had been in special education classes since the first grade.

On April 4, 2001, all testimony concluded.  The trial court adjourned the case early and continued it until the next day so that defense counsel could attempt to secure Randean Madden, an allegedly essential witness.  The court stated: "Obviously if you find your witness overnight *** I will allow you to put that witness on.  If you cannot find that witness, we will continue on toward ending the trial regardless tomorrow."  

On April 5, 2001, Randean Madden did not appear to testify.  Defense counsel informed the court that he had served a subpoena on Madden a week before trial began and that he had spoken with him on the afternoon of April 4 to make transportation arrangements for the following day.  While 
en route
 to Madden's home on April 5, defense counsel tried to reach Madden by phone but a woman answered and never put Madden on the phone.  When defense counsel arrived there, no one came to the door.  Defense counsel called again and the same woman answered and explained that Madden was not there, that she did not know where he was, and that he had not come home the previous night.  

Defense counsel explained that Madden's testimony was crucial to the case and made an oral motion for a 24-hour continuance so that authorities could search for Madden and bring him into court.  Defense counsel then proceeded to make an offer of proof.  According to that offer, Madden would say that on October 18, he was in a parking lot in the 1600 block of Berkeley Avenue when Richard Will was beaten and burned.  At that time, Madden saw an unknown black male, Armstrong, and a man named Stacy Pickens, and heard Armstrong yell that someone was in the bushes.  He then saw Armstrong run over to a barbeque grill to get a handgun.  After retrieving the handgun, Armstrong then ran over to some bushes from where he grabbed a white male.  

Defense counsel stated that Madden would further testify that Pickens, Armstrong, and the unknown black male kicked and hit the white male until they knocked him down, and then continued to beat him once he was down.  Defense counsel further told the court that Madden would say that Armstrong ran into an apartment and came back carrying a white bottle, with which he made a circular motion.  Madden would then say that he saw Pickens hand something to Armstrong and saw Armstrong make a striking motion and throw something.  Finally, Madden would testify that he saw a flash, heard a large "swoosh," and then left the area.

Defense counsel further proffered that in 1999, Madden was incarcerated at the same time as the defendant and that they talked.  Specifically, when the defendant explained why he was in jail, Madden responded, "you weren't there."  In April of 1999, Madden was transferred to the state penitentiary and was released in early 2000.  Sometime after his release, Madden contacted the defendant's father, who, in turn, contacted defense counsel.  Defense counsel further stated that with the aid of an investigator he was able to locate Madden in Ford Heights and arranged to take a written statement from him on May 25, 2000.
(footnote: 3)
 The State objected to defendant's motion for a continuance, arguing that since the case had been pending since 1995, the defendant already had abundant time to bring in Madden.  In response, the trial court denied the defendant's motion for a continuance: "And at this time you're asking, yet, to continue the matter further to see if this witness, who we have yet to see after two previous trials conducted in this case, with this being the first appearance of him.  Very respectfully, the court will deny any further continuances to bring in this witness, who we have yet to see, and this matter will go on."  Later, the court stated: "The court's discretion is that there has been ample opportunity to bring in this witness before.  This witness should have been subpoenaed sometime ago to bring the witness under the court's control, but he has not.  And I am not going to delay this case at this eleventh hour."  After the court admonished the defendant of his right to testify, the defense rested.

At the jury instruction conference, defense counsel objected to the State's proffered non-pattern jury instructions requiring the jury to determine whether the offense was accompanied by exceptionally brutal and heinous conduct indicative of wanton cruelty.  Specifically, counsel argued that because the offense occurred in 1995, the defendant should be judged and sentenced according to the law at that time.  The trial court overruled that objection.

After closing arguments and jury deliberations, the jury returned a verdict finding the defendant guilty of first degree murder.  In a separate jury form, the jury found beyond a reasonable doubt that the victim's death was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.  On May 24, 2001, the defendant moved for a new trial, which was denied.  Following a hearing in aggravation and mitigation, the trial court sentenced the defendant to an extended term of 80 years in the Illinois Department of Corrections. 

 Defendant's first argument on appeal is that the trial court erred in denying his motion for a 24-hour continuance to secure Madden as a witness.  In particular, defendant claims that a continuance was necessary to secure the presence of Madden, whose testimony would have exculpated the defendant of any involvement in the incident with Will.  

As the United States Supreme Court has held: 

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  ***  This right is a fundamental element of due process of law."  
Washington v. Texas
, 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023 87 S.Ct. 1920, 1923 (1967).

Moreover, as section 114-4(f) of the Criminal Procedure Code states, "[a]fter trial has begun a reasonably brief continuance may be granted to either side in the interests of justice."  725 ILCS 5/114-4(f) (West 2000).  Moreover, "[a] *** motion for continuance *** may be granted when *** [a] material witness is unavailable and the defense will be prejudiced by the absence of [that witness's] testimony."  725 ILCS 5/114-4(b)(3) (West 2000).  Nevertheless, a request for a continuance is within the sound discretion of the trial court.  
People v. Ward
, 154 Ill. 2d 272, 304 (1992).  Accordingly, "[the] failure to grant [a continuance] will be reversed on review only when it is shown that the trial court abused its discretion and the refusal somehow prejudiced the defendant.  
People v. Wilson
 (1963), 29 Ill. 2d 82, 91-92."  
Ward
, 154 Ill. 2d at 304.  "In reviewing the denial of a request for a continuance sought to secure the presence of a witness, the factors to be considered are: (1) whether defendant was diligent; (2) whether defendant has shown that the testimony was material and might have affected the jury's verdict; and (3) whether defendant was prejudiced.  
People v. Boland
 (1990), 205 Ill. App. 3d 1009, 1013."  
Ward
, 154 Ill. 2d at 307.

Defendant argues that, in the present case, all three factors are present.  First, he claims that the record clearly demonstrates that defense counsel made diligent efforts to call Madden as a witness.  For instance, in the offer of proof, defense counsel asserted that the defendant did not know that Madden was an eyewitness until sometime in early 1999 when both men were incarcerated and spoke to one another.  After Madden was released from prison in early 2000, he contacted the defendant's father, who, in turn, contacted defense counsel.  He notes that shortly after, counsel located Madden with the assistance of an investigator and obtained a signed statement from him in May 2000.  Thereafter, in June of 2000, defense counsel filed a supplementary answer to discovery that listed Madden as a witness.  

Defendant also points out that one week before April 3, 2001, the date trial began, defense counsel went to Madden's home and personally served him with a subpoena to appear on April 4, 2001.  The next day, Madden did not appear and the court recessed early so that defense counsel could attempt to locate him.  Defendant reiterates that defense counsel spoke to Madden that afternoon and arranged to personally pick him up at his home and bring him to court on April 5, 2001.  On the morning of April 5, 2001, defense counsel again attempted to contact Madden and spoke to a woman who believed that Madden was asleep.  However, when defense counsel arrived at Madden's home, no one answered the door.  Counsel called the number again and the same woman answered and told him that Madden was not there.  The woman said that Madden had not come home the previous night and that she did not know where he was.  Based on this entire sequence of events, defendant asserts that counsel exercised "ample" diligence in securing Madden's testimony.

Second, defendant asserts that defense counsel's offer of proof clearly shows that Madden's testimony was material to this case.  Specifically, Madden's statement established that he was in a parking lot in the 1600 block of Berkeley Avenue and saw Armstrong, Pickens, and an unknown black male beat the victim and set him on fire.  Moreover, defendant claims that Madden's statement established that he had known the defendant from the neighborhood for half of his life and, therefore, Madden was certain the defendant was not the unknown male who participated with Armstrong and Pickens in killing the victim.  Thus, defendant concludes, the exculpatory nature of Madden's testimony creates the great likelihood that it would have affected the outcome of the case and makes it material evidence.

Lastly, defendant asserts that he was prejudiced by the trial court's failure to grant a continuance because Madden's testimony was crucial to defendant's alibi defense.  Specifically, defendant argues, the prior testimony of his father established that the defendant was at home with his family when this incident occurred.  Accordingly, as an eyewitness to the incident, Madden would have offered exculpatory testimony that directly corroborated defendant's father's testimony which, in turn, would have had a "great impact" on the jury.  And because defendant concludes that the outcome of the trial would have been different with the inclusion of that evidence, he argues that the trial court's refusal to continue the trial to allow that testimony resulted in prejudice to him.

As to whether the defendant was diligent in attempting to secure Madden's presence, we first note that Criminal Procedure Code section 114-4(a) requires that a motion for a continuance made more than 30 days after the defendant's arraignment be in writing and supported by affidavit.  725 ILCS 5/114-4(a) (West 2000) ("If the motion is made more than 30 days after arraignment the court shall require that it be in writing and supported by affidavit").  Moreover, Illinois courts have found compliance with Criminal Procedure Code section 114-4(a) to be necessary to comply with Criminal Procedure Code section 114-4(b)(3), which requires that the State be given an opportunity to stipulate to the testimony of the defendant's absent witness.  725 ILCS 5/114-4(b)(3) (West 2000) ("A written motion for continuance made by defendant more than 30 days after arraignment may be granted when: * * * A material witness is unavailable and the defense will be prejudiced by the absence of his testimony;  however, this shall not be a ground for continuance if the State will stipulate that the testimony of the witness would be as alleged").  See 
People v. Prochut
, 27 Ill. 2d 298, 301 (1963) (held that the refusal to grant a continuance to the defendant was not in error where the failure of the defense to file an affidavit rendered the State unable to elect to admit that witnesses, if present, would testify as set forth in affidavit); 
People v. Weiss
, 111 Ill. App. 2d 143, 146 (1969) (held that where defendant did not support his motion by affidavit, "he did not give the People an opportunity to stipulate that the testimony of the witness would be as alleged by the defendant"); 
People v. Rivera
, 64 Ill. App. 3d 49, 53 (1978) ("Thus, it has been held that it was not an abuse of discretion to deny a continuance where, as here, the defense gave the State no opportunity to stipulate to the testimony of the absent witness"); but 
c.f.
 
People v. Goodrich
, 73 Ill. App. 2d 196 (1966) (abstract of op.) (finding that the failure of a defendant to file an affidavit in support of a motion for continuance would not preclude his contention that he should be granted the continuance to locate a key witness, as the necessity for an affidavit is left to discretion of the trial court).   

In the present case, the record, as noted, includes the statement that Madden made to an investigator as an attachment to defendant's motion for a new trial.  However, we find no evidence in the record that the defendant's motion for a continuance was made in writing or that the statement was attached by affidavit.  Therefore, we find under 
Prochut
, 
Weiss
, and 
Rivera
 that it would be within the trial court's discretion to deny defendant's motion for a continuance based on the defendant's failure to comply procedurally with the statute, even if the trial court issued its ruling without relying upon that ground.  See 
People v. Cosby
, 305 Ill. App. 3d 211, 220 (1999) (holding that "it is well established that a reviewing court may affirm a trial court's decision on any grounds in the record").

However, even if we were to agree with the defendant that he exercised due diligence in attempting to secure Madden's presence, we still find that he has failed to satisfy the other two factors outlined in 
Ward
.  To determine the materiality of Madden's statement and its propensity to affect the jury's verdict, we look to the statement itself as described in defense counsel's offer of proof.  Initially, we note that Madden's purported testimony did not offer an alibi that placed the defendant in a different place at that time.  It simply stated that Madden, while driving his car through a parking lot in the middle of the night near the scene of the incident, did not see the defendant at that time.  That portion of the statement, by itself, implies that defendant still could have been at the scene while escaping the notice of Madden.  

In addition, as the State points out, Madden's statement conflicts vastly with the defendant's own statement.  According to defense counsel's offer of proof, Madden would have stated that "[Armstrong] then threw something, and he saw a flash heard a loud swoosh.  And at that point he left the area."  However, defendant's statement alleged that the victim had been set on fire twice, that the victim had been beaten before, during, and after he was set on fire, and that defendant was not necessarily participating in the beating the entire time.  We think the implication of this discrepancy is that either Madden did not witness the entire incident or that either he or the defendant was giving an untrue or inaccurate account of the facts.  

Of course, if Madden did not witness the entire incident, it is of no moment that he would claim that he did not see the defendant at the time he drove by, as it certainly would not tend to "raise a reasonable doubt of the defendant's guilt."  
People v. McLaurin
, 184 Ill. 2d 58, 89 (1998).  Moreover, even if we were to look at this as a witness credibility issue, we find it highly improbable that a trier of fact would have taken Madden's account of the incident over defendant's self-inculpating confession.  As the State notes, Madden was a convicted felon who, as the record demonstrates, was reluctant to come to court and only spoke with the defendant while the two of them were incarcerated.  Moreover, Madden could only assert that he witnessed the crime from some distance away, at around midnight, from inside a moving vehicle.  In the face of defendant's written confession, we simply cannot say that Madden's testimony would have affected the jury's decision in any way.

Because Madden's statement would offer very little in terms of exculpating evidence for the defendant, we cannot say that defendant has met his burden of demonstrating that the absent witness's testimony would have been material to the case, 
i.e.
, that it would have impacted the jury's decision.  Consequently, we must also hold that defendant cannot demonstrate that he was prejudiced – the third 
Ward
 factor– where the only requirement for proving prejudice is to establish that the results of proceedings would have been different.  
People v. Hernandez
, 283 Ill. App. 3d 312, 317 (1996).  Obviously, where we do not find that Madden's testimony would have affected the jury's decision, it is likewise impossible to say that testimony would have altered the outcome of the trial.  Mindful of the highly deferential abuse of discretion standard of review, we ultimately cannot say that the trial court's determination to deny defendant's motion was an abuse of discretion or that no reasonable person would have reached the same conclusion   See 
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).

Alternative to defendant's first argument, he also asserts that defense counsel's failure to request a body attachment when Madden did not appear in court on April 4, 2001, constituted ineffective assistance of counsel because it "thwarted [defendant's] efforts to present evidence that could have changed the outcome of trial."  To establish a claim for ineffective assistance of counsel, Illinois courts adhere to the  two-pronged test of  
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984):  (1) that counsel's performance fell below an objective standard of reasonableness;  and (2) that there is a reasonable probability that defendant was prejudiced by counsel's deficient performance, 
i.e.
, but for counsel's unprofessional errors, the result of the proceeding would have been different.  
People v. Albanese
, 104 Ill. 2d 504, 525-6 (1984).  The failure to satisfy either prong of the 
Strickland
 test precludes a finding of ineffective assistance of counsel.  
People v. Patterson
, 192 Ill. 2d 93, 107 (2000).

In the present case, defendant argues that, given that Madden did not appear in court on April 4, 2001, as he was legally required to do, there was no strategic reason for counsel not to have sought a body attachment to enforce the subpoena for the next day.  Defendant asserts that the record demonstrates that the trial court recessed the trial earlier than it wanted to on April 4, 2001, so that defense counsel could locate Madden.  The record also reveals, defendant notes, that the trial court stated that it would have issued a body attachment to secure Madden's presence had defense counsel requested it on April 4, 2001.  Therefore, defendant concludes, defense counsel's failure to seek the court's assistance in enforcing the subpoena was objectively unreasonable.  Moreover, defendant claims, defense counsel's omission was prejudicial given that, in his opening statement, he told the jury that Madden would testify that the defendant was not involved in the incident.  Under such circumstances, defendant reasons that counsel's inaction rendered the outcome of the trial unreliable.

  We need not ascertain whether counsel's performance was objectively unreasonable under the first prong of the 
Strickland
 test, because defendant clearly cannot meet the second prong.  At trial, the jury was informed of defendant's low IQ and his difficulties with reading and learning, and did not find that those things significantly impacted the potency of his confession.  In addition, as we have previously found, Madden's statement would have provided very little exonerating evidence for the defendant.  Accordingly, even if the jury assumed that Madden, a convicted felon who was reluctant to come to court, had witnessed the entire incident, there is simply no reasonable probability that the jury would have reached a different conclusion if it heard his statement that he witnessed the crime from some distance away, at around midnight, from inside a moving vehicle, and did not see the defendant.  Quite simply, we cannot say that Madden's statement would have been strong enough to overcome the evidence already against the defendant.

Defendant's second argument is that the trial court erred in sentencing him to an 80-year extended-term sentence because it improperly retroactively utilized the recently amended version of section 5-8-2(a) of the Code of Corrections in imposing that sentence.  Specifically, he claims that because the legislature may not "substantively alte[r] the statutory mechanism for imposing an extended term sentence," his case should have been governed by the law in effect at the time of the offense.  Previously, the supreme court has noted:

"Generally, an amendment to a statute will be construed to apply prospectively and not retroactively. See 
Rivard v. Chicago Fire Fighters Union, Local No. 2
, 122 Ill. 2d 303, 309 (1988).  This presumption can be rebutted by express statutory language or by necessary implication. See 
People v. Fiorini
, 143 Ill. 2d 318, 333 (1991); 
Rivard
, 122 Ill. 2d at 309.  There is also an exception to this general rule of prospectivity that arises where the amendment affects only procedure. Where the legislature intends a retroactive application of the amendment and the statutory amendment relates to changes in procedure or remedies, and not substantive rights, it applies retroactively to pending cases. See 
Fiorini
, 143 Ill. 2d at 333; 
Rivard
, 122 Ill. 2d at 310; 
Maiter v. Chicago Board of Education
, 82 Ill. 2d 373, 390 (1980)."  
People v. Digirolamo
, 179 Ill. 2d 24, 50 (1997).

At the time that the present offense occurred, Illinois law did not require that the facts used to enhance a sentence beyond the statutory maximum be proven beyond a reasonable doubt to the jury.  Instead, the imposition of an extended-term sentence was based on finding that the offense was accompanied by a factor in aggravation, and was left to the discretion of the trial court.  See 
People v. La Pointe
, 88 Ill. 2d 482, 498-99 (1981).  However, in the year 2000, the United States Supreme Court in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), ruled that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  
Apprendi
, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.  Accordingly, 
effective February 23, 2001, the legislature enacted Public Act 91-953, which amended the extended-term sentencing statute.  Pub. Act 91-953, eff. February 23, 2001 (amending 730 ILCS 5/5-8-2(a) (West 1998)).  The section now reads that where a "trier of fact" finds "beyond a reasonable doubt" the existence of one or more aggravating factors listed in section 5-5-3.2(b) of the Code of Corrections, the trial court may sentence the defendant to an extended term.

In the present case, the defendant argues that where Public Act 91-953 "fixed" the infirmities of the statutory scheme that violated 
Apprendi
, it actually altered the substantive elements of the offenses for which the State sought the imposition of an extended-term sentence.  For after February 23, 2001, the State had to meet the highest standard of proof for aggravated sentencing factors, and the defendant had to be given the opportunity to have the trier of fact determine those facts.  Because the aggravated sentencing factors are considered elements of the offense rather than sentencing factors, and because Public Act 91-951 altered the elements to be proved, defendant argues that the legislature effected a change in substantive law that cannot be applied retroactively.  See 
Digirolamo
, 179 Ill. 2d at 50.  Consequently, defendant concludes, the trial court erred in failing to use the law in effect at the time of the offense.

Initially, we note that there can be no dispute that 
Apprendi
 applies to this case even though the offenses occurred in 1995.  In 
People v. Ford
, 198 Ill. 2d 68, 72-73 (2001), for example, the supreme court reiterated that new constitutional rules of criminal procedure apply to all cases which are still pending at trial or are on direct appeal.  Section 5-8-2(a) of the Code of Corrections, we note, simply has codified those new constitutional rules of procedure.

Even though the amended version of section 5-8-2(a) of the Code of Corrections was not in effect at the time the instant offenses were committed, we find that it does apply to this case.  First, as the State notes, the sentencing provisions that were in effect at the time of the instant offense were not struck down as unconstitutional.  In fact, the supreme court has found that 
Apprendi
 has not rendered any statute facially unconstitutional and has clarified that the statutes are not void 
ab initio
.  
People v. Jackson
, 199 Ill. 2d 286, 300-01 (2002); 
Hill v. Cowan
, 202 Ill. 2d 151, 156-58 (2002).  Rather, the court has found that 
Apprendi
 could only make the sentencing statutes unconstitutional if the procedures used to implement an extended-term sentence violated 
Apprendi
's mandate.  
Jackson
, 199 Ill. 2d at 301; 
Hill
, 202 Ill. 2d at 158.  Consequently, we agree with the State that defendant could be sentenced in accordance with the statutory scheme as long as the procedures utilized by the trial court comported with 
Apprendi
.

In addition, because the amended version of section 5-8-2(a) of the Code of Corrections only addresses the 
procedural
 aspects for complying with 
Apprendi
, there is nothing to prohibit its application in the present case.  As our sister court in the Second District recently held:

"A defendant does not, however, have a ‛vested right' in the modes of procedure used at his trial. 
Miller
[
 v. Florida
], 482 U.S. [423,] 430, 96 L. Ed. 2d [351,] 360, 107 S. Ct. [2446,] 2451 [(1987)]; 
Dobbert v. Florida
, 432 U.S. 282, 293, 53 L. Ed. 2d 344, 356, 97 S. Ct. 2290, 2298 (1977); 
People v. Felella
, 131 Ill. 2d 525, 536, 546 N.E.2d 492, 497 (1989). The 
ex post facto
 clause does not limit the legislature's control of remedies or modes of procedure, so long as they do not affect matters of substance.  
Beazell v. Ohio
, 269 U.S. 167, 70 L. Ed. 216, 46 S. Ct. 68 (1925).

The amended versions of sections 111-3 and 5-8-2(a) merely affect a mode of procedure. 725 ILCS 5/111-3 (West 2000); 730 ILCS 5/5-8-2 (West 2000). They do not make the law more onerous on defendant. ***  The amendments clearly did not alter legal rules to make convictions easier, nor did they increase the punishment for a previously committed offense or make any changes to the elements of the offense of murder. The only change made is that the finder of fact must determine the existence of the relevant aggravating factor beyond a reasonable doubt, thereby increasing the burden required of the State."  
People v. O'Quinn
, 339 Ill. App. 3d 347, 362-63 (2003).

Accordingly, we reject defendant's contention on this issue.

Defendant's last argument is that section 111-3(c-5) of the Criminal Procedure Code (725 ILCS 5/111-3(c-5) (West 2000)) is unconstitutional because it allows the State to add elements of an offense by only giving written notification to the defendant.  Specifically, in the present case, defendant asserts that because his indictment did not inform him of his eligibility for an extended-term sentence, his extended-term sentence violated violates article I, section 7, of the Illinois Constitution, which provides:

"No person shall be held to answer for a crime punishable by death or imprisonment in the penitentiary unless with the initial charge has been brought by indictment of a grand jury or the person has been given a prompt preliminary hearing to establish probable cause."  Ill. Const. 1970, art. I, §7.

In other words, defendant claims that section 111-3(c-5) of the Criminal Procedure Code unconstitutionally empowers the State to add elements of an offense without seeking grand jury approval or a probable cause hearing.  The question of whether a statute is constitutional is subject to a 
de novo
 review.  
People v. Carney
, 196 Ill. 2d 518, 526 (2001).

Essentially, we think that defendant is cloaking the argument that his indictment is insufficient under 
Apprendi
, which has been summarily rejected, in the guise of questioning the statute's constitutionality.  By now, it is well established that the supreme court uniformly holds that the due process clause of the fourteenth amendment, upon which 
Apprendi
 was entirely based, does not require notice whatsoever of sentence-enhancing facts.  
People v. Ford
, 198 Ill. 2d 68, 72 n.1 (2001); 
People v. Thurow
, 203 Ill. 2d 352, 366-67 (2003).  See also, 
People v. Tomasello
, 329 Ill. App. 3d 1053, 1057-58 (2002).  
To avoid this pitfall, the defendant in the present case is eschewing the challenge of the sufficiency of his indictment for a direct challenge to the constitutionality of the amended version of section 111-3(c-5) of the Criminal Procedure Code 
via
 article I, section 7, of the Illinois Constitution.  However, this argument too has been addressed by Illinois courts.

By way of background, we note that the United States Supreme Court has uniformly applied the sixth amendment's fiat that the accused be informed of criminal accusations against him.  
In re Oliver
, 333 U.S. 257, 273, 92 L. Ed. 682, 694, 68 S. Ct. 499, 507 (1948).  Moreover, in defining a state criminal defendants' rights to notice under the sixth amendment, the Supreme Court has concluded that such defendants have a right to "reasonable notice" so as to guarantee that they are afforded an opportunity to defend against the charges.  
Oliver
, 333 U.S. at 273, 92 L. Ed. at 694, 68 S. Ct. at 507.  As the Supreme Court noted in the venerable 
Hodgson v. Vermont
, 168 U.S. 262, 269, 42 L. Ed. 461, 463, 18 S. Ct. 80, 82 (1897): 

"[I]n all criminal prosecutions the accused must be informed of the nature and cause of the accusation against him; that in no case can there be, in criminal proceedings, due process of law where the accused is not thus informed, and that the information which he is to receive is that which will acquaint him with the essential particulars of the offen[s]e, so that he may appear in court prepared to meet every feature of the accusation against him."

Previously, this court has recognized that the fifth amendment's guarantee to indictment by a grand jury does not apply in the context of a challenge to state-court indictment.  For example, in two cases decided prior to 
Apprendi
, 
People v. Perez
, 101 Ill. App. 3d 64, 73 (1981), and 
People v. Williams
, 90 Ill. App. 3d 524, 527 (1980), this court found that aggravating factors are not necessary elements of the crime charged and need not be alleged in the indictment or proved at trial.

Our holding in these cases is consistent with the United States Supreme Court's decision in 
Ring v. Arizona
, 536 U.S. 534, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002) : that the fifth amendment does not necessitate that aggravating factors, even if they are the equivalent of the elements of an offense, be pled in a state-court indictment.  In also arriving to this conclusion, the Supreme Court of North Carolina conducted its own independent research on the matter:

"Our independent review of decisions from our sister states reveals that to this date every state court addressing the above-noted issue has held that 
Ring
 does not require that aggravating circumstances be alleged in the indictment. See, 
e.g.
, 
Stallworth v. State
, __So. 2d__ *** (Ala. Crim. App. Jan. 31, 2003) (No. CR-98-0366) (indicating that 
Ring
 did not change prior case law holding that aggravators do not need to be pled in an indictment); 
Bottoson v. Moore
, 833 So. 2d 693, 695 (Fla.) (per curiam) (rejecting arguments based upon 
Ring
), 
cert.
 
denied
, ___ U.S. ___, 123 S. Ct. 662, 154 L. Ed. 2d 564 (2002); 
Terrell v. State
, 276 Ga. 34, 40, 572 S.E.2d 595, 602 (2002) (concluding in a post-
Ring
 challenge to an indictment that the indictment need not allege aggravating circumstances); 
State v. Gilbert
, 103 S.W.3d 743, 747 (Mo. 2003) (
en banc
) (holding that 
Ring
 had no effect on the court's previous rejection of the argument that indictments need to allege aggravators); 
State v. Oatney
, 335 Or. 276, 296, 66 P.3d 475, 487 (2003) (holding that 
Ring
 did not address the issue of whether aggravators needed to be pled in the indictment and, therefore, that court's prior holding that an indictment need not contain aggravators remained unchanged); 
State v. Berry
, __S.W.2d __, __ *** (Tenn. Crim. App. Apr. 10, 2003) (No. M2001-02023-CCA-R3-DD) (holding, post-
Ring
, that 
Apprendi
 did not apply to require the State to include aggravators in indictments)."  
State v. Hunt
, 582 S.E.2d 593, 604 (N.C. 2003).

Thus, as noted by the North Carolina Supreme Court, "[t]he only possible constitutional implication that 
Ring
 and 
Apprendi
 may have in relation to our capital defendants is that they must receive reasonable notice of aggravating circumstances, pursuant to the Sixth Amendment's notice requirement."  
Hunt
, 582 S.E.2d at 604.  In the present case, it is uncontested that defendant received a written notice of the State's intent to seek an extended sentence, based on the brutal and heinous nature of the crime, prior to his third trial.  Because it cannot seriously be contended that this is not "reasonable" notice, defendant's argument on this ground must also fail.

For the foregoing reasons, we affirm the decision of the trial court.

Affirmed.

THEIS, P.J., and  KARNEZIS, J., concur.

FOOTNOTES
1:  Defendant's first trial ended with a hung jury, and his second ended in a mistrial after the jury unanimously concluded it could not agree on a verdict. 

2:  In its notice of intent to seek an extended term, the State asserted that section 5-5-3.2 of the Code of Corrections (730 ILCS 5/5-5-3.2 (West 2000)) authorized the imposition of an extended sentence.  To clarify, we note that section 5-5-3.2 is actually a list of factors in aggravation that would authorize a court to sentence a defendant to an extended term under section 5-8-2(a).

3:  The written statement of Randean Madden was attached to defendant's motion for a new trial but was never presented to the trial court at trial.